**ABRAMS FENSTERMAN,** *ET AL.*
Deborah J. Piazza, Esq.
Danielle Elias, Esq.
630 Third Avenue, 5th Floor
New York, NY 10017
Tel: (212) 279-9200
Fax: (212) 279-0600
dpiazza@abramslaw.com
delias@abramslaw.com

*Proposed Counsel for Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| | Case No. 11-47056 (ESS) |
| PENINSULA HOSPITAL CENTER, *et al.*, | |
| Debtors. | Joint Administration Pending |

------------------------------------------------x

### MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363, 364 AND FRBP 2002, 4001 AND 9014 AUTHORIZING DEBTORS TO (I) OBTAIN SECURED POSTPETITION FINANCING ON SUPERPRIORITY SECURED BASIS ("DIP LOAN") AND (II) UTILIZE CASH COLLATERAL AND OTHER RELATED REQUESTS

Peninsula Hospital Center ("**PHC**") and Peninsula General Nursing Home Corp. ("**PGN**", and, together with PHC, the "**Debtors**" or "**Borrowers**") move this Court (this "**Motion**") for the entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**") pursuant to §§ 105, 361, 362, 363, and 364 of 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure, authorizing the Debtors to obtain postpetition financing and utilize cash collateral and granting security interests as provided herein on a secured and super-priority basis. No cross-collateralization of any pre-petition debt is being requested.

**Preliminary Statement**

1) On August 16, 2011 an involuntary chapter 11 proceeding was filed against PHC. On September 19, 2011(the "**Petition Date**"), PHC consented to entry of an order for relief under Bankruptcy Code chapter 11 and PGN filed for relief under Bankruptcy Code chapter 11.

2) The Debtors continues to operate their businesses and manage their assets as Debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3) A Creditors' Committee has not yet been appointed by the Office of the United States Trustee.

4) This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of the Debtor's chapter 11 case and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5) The statutory predicates for relief requested herein are Bankruptcy Code §§ 105, 361, 362, 363, and 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

**Background**

6) PHC operates a 173-bed acute care community teaching hospital campus with resident training programs in orthopedics, general surgery, family practice, dentistry and podiatry. PHC provides a full continuum of care including acute, rehabilitative, outpatient, diagnostic, primary care and wellness to the communities of the Rockaways, the Five Towns of Nassau County and parts of Queens and Brooklyn. PHC provides a wide range of services

which include: Traumatic Brain Injury Unit, Angels on the Bay Pediatric Unit, Family Health Center, Diabetes (Adult and Pediatric) Treatment Centers, Advanced Imaging Services (including MRI/MRA, 16-slice CT, Mammography Unit, Nuclear Medicine, Radiation Oncology service with linear accelerator, Podiatry, Dental, Orthopedics and Eye Care Center on site. Additionally, PHC operates a 16-bed private room Inpatient Hospice Care Center – Butterflies by the Sea – the Eisenstadt Hospice Center at Peninsula. PHC also serves as the hospital affiliate for the Joseph P. Addabbo Family Health Center, and are a Federally Qualified Health Center with the New York State Department of Health Stroke Center designation.

7) PGN is a nursing home facility encompassing a 200-bed long-term care and rehabilitation center (Peninsula Center for Extended Care and Rehabilitation).

8) The Debtors employ almost 1,000 individuals.

9) The Debtors derive mutual benefit from their relationship with each other and being located on adjoining properties. They share over-head costs, nursing staff and benefit from cross-referrals. The value of each entity is substantially increased by the continued operations of the other.

**Events Leading to the Commencement of the Debtors' Chapter 11 Cases**

10) Like most not-for-profit hospitals and nursing homes operating in New York, the Debtors have been struggling financially in recent years, as operating costs have risen and reimbursement for services has failed to keep pace.

11)

12) On February 23, 2009, Medisys Health Network Inc., ("Medisys") took control over the boards of both PGN and PHC. Medisys also assumed responsibility over the operations of the Debtors' essential services including billing and cash management.

13) Increased costs coupled with the series of government cuts in reimbursement rates for services rendered by the Debtors for their patients, resulted in the Debtors defaulting on certain obligations. The Department of Health, concerned about the Debtors' financial viability and their ability to provide proper care for their patients, started setting deadlines for corrective measures to be taken, if the Debtors wanted to avoid a directive to close.

14) By letter dated August 11, 2011, Medisys notified the Debtors that as of August 22, 2011 it was severing its relationship with the Debtors and terminating any administrative and other shared services. Medisys also demanded payment of past due amounts to Medisys and its affiliates estimated at $6 million. Faced with Medisys' abrupt withdrawal and the imminent closure of the facilities, the Debtors' directors interviewed and negotiated with separate constituencies and groups as to running the Debtors' operations. Proposals were received from at least four different groups. After an intense period of due diligence and negotiations, the Board concluded that a proposal by an affiliate of the Revival Home Health Care entities – privately owned health care organizations having an established reputation with the DOH-- was most likely to succeed in fulfilling the Boards' paramount goal of keeping PHC operating and providing services to the Rockaway peninsula community.

15) On September 1, 2011 the Debtors entered into an agreement (the "Letter Agreement"), a copy of which is annexed hereto as Exhibit A with the Credit Agreement Documents, with Revival Acquisition Group LLC ("Revival") in which Revival agreed to provide an $8 million line of credit (the "DIP Loan") and, inclusive of the line of credit, pay

cash and assume debt totaling $27 million to discharge the Debtors' liabilities. Although its stated intent is to do so for longer, Revival has formally agreed to maintain the hospital and nursing home for a minimum period of three years. In exchange, the Debtors agreed that in their bankruptcy cases, they would seek approval of the DIP Loan and the Letter Agreement, with the DIP Loan to be secured by a first lien and a superpriority claim on all of the Debtors' assets. Upon court approval, the directors serving on Debtors' Board agreed to resign and appoint Revival's nominees in their stead. Revival also agreed to fund $250,000 in retainer fees for the Debtors' professionals and to make a loan of $250,000 to the Debtors. At this point Revival has paid retainers and legal fees totaling $290,000 for the Debtors' professionals and has loaned $1,750,000 to the Debtors.

16) As part of the Letter Agreement, Todd Miller, the Chief Operating Officer of Revival Home Health Care, LLC, was hired to act as the Chief Restructuring Officer of the Debtors. At the time of the transition, there were only eight patients being attended at PHC; the hospice center had closed and the DOH had issued orders of diversion preventing ambulances from bringing any new patients. Because of Medisys' abrupt resignation, billing had ceased and the financial and reporting controls had been in disarray.

17) Since the management transition was effected, the DOH has rescinded its orders diverting patients away from PHC and closing the operating room. The operating room and the hospice center have been re-opened, and the patient census at PHC has risen dramatically. Financial and cash management controls are being re-established. DOH on-site monitoring has continued and the DOH receives a daily report from management.

18) The Debtors believe that with a new management team and fresh capital they can increase revenue by attracting more patients to the hospital than they have previously.

Currently, 80% of the population on the Rockaway peninsula accesses health care off the peninsula; the hospital is used by them primarily for its emergency services. The Debtors plan to offer a wider range of services to attract the local community. The Debtors expect to offer cardiac services, increase surgery capabilities and offer improved oncology services (among others).

19) The assessment of new management is that neither the hospital nor the nursing home was aggressively managed in recent years and that implementation of new procedures will result in significant savings as well as increased revenues. For example, PHC is recruiting a new case manager because the average length of stay of its patients is above average. Longer stays are detrimental to the patients as well as PHC's revenues. Aside from managing care better, PHC's staff is also building new relationships with home care agencies and nursing homes to more quickly obtain placement for its patients.

Previous purchasing and maintenance procedures have also been identified as inefficient; the Debtors believe that properly managing these procedures and vendor relationships will generate significant savings.

**Assets and Significant Existing Liens**

20) PHC's principal assets are its real property and its accounts receivable. The existing liens against PHC's real property are as follows: (i) a first mortgage lien in favor of the trustee of certain Industrial Development Agency bond-holders in the approximate amount of $750,000; (ii) a lien of the NYC Water Board in the approximate amount of $1,000,000; (iii) several judgment liens in favor of the Benefit Funds in the approximate amount of $18.9 million; and (iv) miscellaneous smaller judgment liens. The Debtors estimate the value of the real property at substantially less than the aggregate value of these liens.

21) PHC does not currently have a reliable figure as to its receivables given the disarray of the record keeping in the wake of Medisys' withdrawal. However, based on the prior years' revenues and the reimbursement claims of Medicare and Medicaid for the prior year's overpayments, the Debtors estimate that PHC's collectible receivables, added to the estimated value of the real property, are substantially less than that needed to satisfy the Benefit Funds' claim which is secured by the receivables and the real estate.

22) With respect to PHC, it is believed that the mortgages, liens and secured claims exceed the value of PHC's assets.

23) As to PGN, real property is encumbered by (i) a first mortgage lien in favor of New York State Housing Finance Agency in the approximate amount of $950,000; (ii) a lien of the NYC Water Board in the approximate amount of $222,000; (iii) several judgment liens in favor of the Benefit Funds in the approximate amount of $3.4 million; (iv) a mortgage lien in favor of Revival Funding Co., LLC in the amount of $1,500,000. PGN's receivables stand as security for the judgment amounts due to the Benefit Funds and Revival's $1,500,000 mortgage note and also for an additional loan of $250,000 made by Revival pursuant to the

Letter Agreement. The Debtors believe that the Debtors' real property and collectible receivable values comfortably exceed the secured and lien claims against these assets of PGN.

## The Prepetition Loan Agreements

24) Prior to the commencement of these cases, the Debtors were in dire need of capital. To avoid the need for an emergency filing, the Postpetition Lender agreed to loan funds to the Debtors on a secured basis in the prepetition period, through two instruments.

25) The first instrument was a Loan Agreement and Promissory Note executed by the Debtors dated September 1, 2011, pursuant to which the Postpetition Lender lent the Debtors $250,000 on a secured basis. The Debtors executed a security agreement to that effect, and the Postpetition Lender filed UCC-1 financing statements with Secretary of State of the State of New York.

26) The second instrument was a Mortgage Note executed by PGN in the amount of $1,500,000 dated September 14, 2011 pursuant to which the Postpetition Lender lent the Debtors $1,500,000, secured by all assets of the Debtors as well as a mortgage on the real property of the Debtors. The Debtors executed a security agreement to that effect, and the Postpetition Lender filed UCC-1 financing statements with the Department of State of the State of New York and a recorded mortgage in Queens County.

27) The maturity date under both of these instruments is the same as the Credit Agreement maturity date.

## The Need For And Terms Of Postpetition Financing And Use Of Cash Collateral

**A. The Debtors Have Operated Without a Bank Line of Credit**

28) The Debtors in the past have operated without a line of credit or other loan facility. However, because of the Debtors' increased costs, the Debtors have recently defaulted on certain of their prepetition obligations. The proposed line of credit, together with the exit financing commitment provided in the Letter Agreement, will place the Debtors in a stronger position to emerge successfully from chapter 11. Hence, the relief requested herein is in the best interests of the Debtors' estates.

29) The Debtors have determined in an exercise of their sound business judgment that they are in need of postpetition financing in order to sustain operations and successfully emerge from chapter 11. Since the entire transaction is in the best interests of the estates and their creditors, the Court should approve it. Moreover, the proposed credit facility is neither burdensome nor prejudicial to, nor adversely affects the rights of other secured creditors.[1]

**B. Terms of Postpetition Financing**

30) Following negotiations, the Debtors and Revival Funding Co., LLC (the "**Postpetition Lender**") have agreed to postpetition financing ("**Postpetition Financing**") pursuant to the terms of a credit facility providing the Debtors postpetition financing up to an aggregate principal amount not to exceed Eight Million ($8,000,000.00) Dollars (the "**Credit Agreement**" and together with the Letter Agreement, the "**Credit Agreement Documents**"). A condition precedent to funding the Credit Agreement is that the Court approves the overall transaction between the Debtors and Revival.

31) A summary of the Credit Agreement terms and conditions are as follows: [2]

---

[1] As set forth below, to the extent the Postpetition Financing primes any prepetition secured lender, it does so on consent of such lender.

[2] The following summary of the terms of the Credit Agreement is intended solely to provide the Court and interested parties with a brief overview of the significant terms thereof. For a complete description of the terms and conditions of the Credit Agreement, reference should be made to the Credit Agreement Documents substantially in the form annexed hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Credit Agreement Documents. In the event of any conflict or inconsistency between the provisions of

**The Credit Agreement:**

**Borrowers:** Peninsula Hospital Center & Peninsula General Nursing Home Corporation

**Lender:** Revival Funding Co., LLC

**Credit Facility:** A line of credit not to exceed $8,000,000.00

**Use of Proceeds:** Primarily for the financing the Debtors' day-to-day operations, including, without limitation, payroll expenses and outstanding postpetition creditor obligations.

**Availability:** Advances shall be available immediately upon entry of the Order authorizing the financing, including the terms of the Letter Agreement, and signing of the LOC Agreement and Related Documents.

**Financial Terms:** Prior to the occurrence of a repayment Event of Default, the outstanding principal balance of the Credit Agreement shall bear interest at the rate of six percent (6%) per annum. Upon the occurrence of a repayment Event of Default, and for as long as the same shall remain outstanding, at the option of Postpetition Lender, all Obligations of Borrower shall bear interest at the rate of nine percent (9%) per annum (the "Default Rate"), which shall be due as one lump sum payment.

**Collateral:** All of Debtors' tangible and intangible assets and property (on a consolidated basis) (collectively, the "<u>Collateral</u>") shall be collateral for all Obligations incurred by the Debtors (on a consolidated basis).

**Carve Out:** Lender's security interests and liens on the Collateral shall be subject and subordinate only to the following: (i) payment of United States Trustee's fees pursuant to 28 U.S.C. §1930(a)(6) plus interest at the statutory rate for any fees not paid in a timely manner, and any fees payable to the Clerk of the Bankruptcy Court; (ii) fees and expenses of attorneys, accountants and other professionals retained in the Chapter 11 cases, to the extent allowed by the Bankruptcy Court, but in no event to exceed $500,000.00; and (iii) reasonable fees and expenses of a Chapter 7 trustee allowable pursuant to 11 U.S.C. §726(b) in an amount not to exceed $15,000.00 (items (i), (ii), and (iii), collectively, the "<u>Carve Out</u>").

**Lien Priority:** The Postpetition Lender is granted valid, binding, enforceable, first priority and perfected security interests and liens, subject only to the Carve Out and certain prior filed mortgages, security interests and liens other

---

this Motion and the Credit Agreement Documents, the Credit Agreement Documents shall control in all respects. All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement Documents.

than those of the Benefit Funds. Liens and security interests of the Benefit Funds are to be subordinated up to 60% as set forth in the Collateral Sharing Agreement.

**Perfection:** The creation, perfection and priority of the liens granted to the Postpetition Lender under and in connection with the DIP financing shall be automatic without the necessity of the execution, delivery or recordation of any filings, registrations or other notifications by Debtors of any security agreements, financing statements, or other similar agreements, documents or notices, although Postpetition Lender shall be authorized to obtain and or file, and Borrower shall so provide, any of the foregoing upon the request of Postpetition Lender in the exercise of its sole discretion.

**Covenants:** Usual for transactions of this kind, including, without limitation, affirmative and negative covenants with respect to other indebtedness, as well as restrictions against any change in management, the granting of new liens, and the disposition of assets, without consent.

**Funding Conditions:** Usual for transactions of this kind, including, without limitation, the entry of any Interim Order and the entry of the Final Order, satisfactory in form and substance to the Postpetition Lender approving, granting or authorizing (i) the transactions contemplated by the Credit Agreement Documents, and (ii) the liens and super-priority administrative claim status and the lien priorities described in the Credit Agreement Documents and the Collateral Sharing Agreement.

**Events of Default:** The Credit Agreement Documents contain certain defaults and events of default provisions including but not limited to failure to make payments to Postpetition Lender when due, the filing or confirmation of plans containing provisions adverse to the Lender and change in ownership.

**Other Provisions:** The Credit Agreement Documents provide for certain representations and warranties customary for transactions of this kind, all as more fully set forth therein. <u>No cross-collateralization of pre-petition debt is being sought.</u>

## C.     Cash Collateral

32) On December 2, 2010, each of the Debtors executed confessions of judgment in favor of certain benefit funds (the "Benefit Funds") affiliated with the Union.  Also on December 2, 2010, each of the Debtors executed a security agreement granting the Benefit Funds a security interest in the Debtors' respective receivables. As such, all or a significant portion of

11

the Debtors' cash is Cash Collateral. The Debtors need access to Cash Collateral of the Benefit Funds to effectively continue to operate their business.

33) Specifically, the Debtors have certain recurring obligations relating to the operation and maintenance of their business, including (1) employee wages, salaries, and benefit claims, (2) marketing and related expenses, (3) supplies, (4) rental and equipment lease fees, and (5) general and administrative overhead expenses. The Debtors must use Cash Collateral to meet these expenses in the future. Furthermore, the Debtors have numerous other anticipated and unanticipated expenses that they need to incur and pay to ensure that their business is properly operated and maintained.

34) The Benefit Funds have consented to the Debtors' use of Cash Collateral pursuant to the Collateral Sharing Agreement (the "CSA") — substantially in the form annexed hereto as Exhibit B. The CSA requires the Debtors to pay the Benefit Funds $157,000 weekly. It also embodies an agreement between the Benefit Funds and Revival for Revival to share in the Benefit Funds' liens on a 60% for Revival- 40% for the Benefit Funds, basis.

## Relief Requested

35) By this Motion, pursuant to §§ 105, 361, 362, 363, and 364 and to Bankruptcy Rules 2002, 4001, and 6004, the Debtors seek the entry of an Order that:

    (a)    authorizes the Debtors, as borrowers, to obtain postpetition debtor-in-possession financing in the form of the Credit Agreement, up to an aggregate principal amount of $8,000,000, and are permitted by the court to abide by all of the obligations pursuant to, and subject to the terms and conditions set forth in the Credit Agreement Documents, including all terms set forth in the Letter Agreement;

    (b)    authorizes the Debtors to execute and enter into the Credit Agreement Documents and to perform such other and further acts as may be required under the Credit Agreement Documents or otherwise in connection with the Credit Agreement;

(c) authorizes the Debtors to use cash collateral (as defined in the Bankruptcy Code, "**Cash Collateral**") in which the Union has any interest;

(d) grants superpriority administrative expense claims to the Postpetition Lender payable from, and having recourse to, all prepetition and postpetition property of the Debtors' estates (including property that currently constitutes Prepetition Collateral) and all proceeds thereof, subject only to the Carve Out, to secure any and all of the Obligations;

(e) limits the right of each of the Debtors' and their estates' to surcharge against the Collateral on any basis, including pursuant to § 506(c); and

(f) (i) authorizes the Debtors to borrow forthwith in one or more drawings under the Credit Agreement Documents up to an aggregate principal or face amount not to exceed $8,000,000, (ii) grants the liens and the superpriority claim, as requested herein, to the Postpetition Lender, (iii) authorizes the Debtors' use of cash collateral of the Union and (iv) grants the Union adequate protection as described herein.

## Applicable Authority

**A.    Postpetition financing under § 364.**

36) Section 364 distinguishes among (i) obtaining unsecured credit in the ordinary course of business, (ii) obtaining unsecured credit outside the ordinary course of business, and (iii) obtaining credit with specialized priority or on a secured basis.  If a debtor-in-possession cannot obtain postpetition credit on an unsecured basis under § 364(b), § 364(c) permits the court to authorize the debtor to obtain credit or to incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property, a junior lien on encumbered property, or a combination of the foregoing.  Failing that, § 364(d) permits the court to authorize a debtor to obtain credit secured by a lien senior to existing prepetition liens subject to certain protections.  However, courts have consistently held that the burden to obtain a "priming" financing under § 364(d) is exceptionally high .

**B.    The availability of alternative financing solutions.**

37) Both §§ 364(c) and (d) require, as a starting point, that the Debtors demonstrate they are unable to obtain credit on more favorable terms than those offered in the proposed financing. Specifically, § 364(c) requires a finding, made after notice and a hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." *See In re Garland Corp.*, 6 B.R. 456, 461 (1st Cir. BAP 1980); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (opining that a debtor seeking unsecured credit under § 364(c) must prove that it was unable to obtain unsecured credit pursuant to § 364(b)); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under §§ 364(a) and (b)). Section 364(d)(1)(A) similarly requires that the Debtors demonstrate they are "unable to obtain such credit otherwise." 11 U.S.C. § 364(d)(1)(A).

38) To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "a good-faith effort that credit was not available" without the protections afforded to potential lenders by § 364(c). *Bray v. Shenandoah Federal Savings & Loan Assn. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.; see also Ames*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R.

107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, *Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

39) As described herein, and as the evidence at the hearing will demonstrate, the Debtors could not have obtained postpetition financing on the terms and of the type required in this chapter 11 case on an unsecured basis or on any terms other than the proposed Credit Agreement. However, the Postpetition Lender has made it abundantly clear that it is only willing to lend under the Credit Agreement if the Debtors will agree to and are permitted by the Court to abide by all the terms in the Letter Agreement. To summarize the position taken by the Postpetition Lender during the negotiation of the Credit Agreement terms, Revival is in the health care industry, and it is fully confident in its ability to successfully operate the Debtors to bring them out of bankruptcy as viable entities. However, Revival needs to be given the platform to effectuate its management plans, which form the foundation of the terms of the Letter Agreement.

40) Amongst the terms the Debtors have agreed to under the Credit Agreement Documents is the collateralization of all of the Obligations, regardless of which of the Debtors incurred the same, by the assets of both Debtors. This is appropriate for several reasons. First, the Postpetition Lender would not enter the Credit Agreement Documents but for this collateralization agreement. Second, PGN's value is dramatically increased by the existence of PHC, so it is very much to the benefit of PGN's creditors to make this concession to provide for Credit Agreement funds to PHC. This collateralization agreement is not prohibited by the Bankruptcy Code, and has been approved before. See In re St. Vincents Catholic Med. Ctrs., 2010 Bankr. LEXIS 6178 (Bankr. S.D.N.Y. Apr. 16, 2010) (order of bankruptcy court granting DIP lender a lien on assets of jointly administered but

15

non-consolidated debtors); In re Thornwood Furniture Mfg., 2011 Bankr. LEXIS 2023 (Bankr. D. Ariz. Mar. 1, 2011) (same); In re Tex. Gulf & Harbor, Ltd., 2011 Bankr. LEXIS 1991 (Bankr. S.D. Tex. Jan. 11, 2011) (same); In re Fiddler's Creek, LLC, 2010 Bankr. LEXIS 6015 (Bankr. M.D. Fla. Dec. 28, 2010) (same).

41) In any event, the Debtors are out of options, and the terms of the Letter Agreement provide them with a very real way to remain viable and provide much-needed medical and assisted living services to the entire Rockaway Peninsula community, while providing hundreds of jobs to locals, and maintaining and improving value for the Debtors' creditors.

42) The Debtors' efforts to seek necessary postpetition financing from other sophisticated lending institutions satisfy the statutory requirements of §§ 364(c) and (d)(1)(A) with respect to the unavailability of alternate financing. *See, e.g., Ames*, 115 B.R. at 40 (approving § 364(c) financing facility and holding that the debtor made reasonable efforts to obtain less onerous terms when it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (opining that a debtor "must make an effort to obtain credit without priming a senior lien"); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (requiring demonstration that less onerous financing was unavailable); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 n.9 (D. Del. 1984).

43) Accordingly, the Debtors submit that that the first prong of both §§ 364(c) and (d) – non-availability of credit except on the terms offered in the Credit Agreement – is satisfied in this case.

**C.    The Credit Agreement satisfies the adequate protection requirements of § 364(d).**

44) As discussed above, in order for the Court to authorize postpetition financing secured by a lien equal to existing liens on the Debtors' assets, the Debtors must demonstrate that "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1)(B). The Debtors bear the burden of proof on the issue of adequate protection. 11 U.S.C. § 364(d)(2).

45) In this case, § 364(d) is implicated by virtue of the proposed Postpetition Lender's request that the funds loaned pursuant to the Credit Agreement be secured by, *inter alia*, liens on and security interests in all of the Debtors' assets, equal in right (to the extent agreed-to in the Collateral Sharing Agreement) to the Benefit Funds' liens. However, the adequate protection requirement of § 364(d)(1)(B) is satisfied by virtue of the fact that the Benefit Funds' have consented to a partial priming of its liens pursuant to the terms of the Collateral Sharing Agreement.

**D.    Use of Cash Collateral.**

46) Pursuant to § 363(c)(2), a debtor-in-possession may not use cash collateral without the consent of the secured party or court approval. 11 U.S.C. § 363(c)(2). Pursuant to the Collateral Sharing Agreement, the Benefit Fundshave consented to the Debtors' use of cash collateral in which they have an interest.

47) By this Motion, the Debtors request the authority to use all cash collateral existing on or after the Petition Date that may be subject to liens in favor of the Benefit Funds.

**E.    Conclusion.**

48) The Debtors have exercised their sound and prudent business judgment in deciding to seek the Credit Agreement and in entering the Letter Agreement with the Postpetition Lender. The terms of the Credit Agreement and Letter Agreement are fair, reasonable, and in

the best interests of the Debtors' estates, creditors, and other parties-in-interest. Without the liquidity provided by the Credit Agreement, the Debtors would be unable to, among other things, fund the operation of their businesses, and possibly be required to close their doors, just like many other New York health care facilities have recently been forced to do. Moreover, the Credit Agreement will greatly assist the Debtors in their effort to consummate a plan of reorganization or otherwise exit bankruptcy. Thus, in the absence of the Credit Agreement, serious and irreparable harm to the Debtors' business, the estate, creditors, and other parties-in-interest would occur.

49) No trustee, examiner or creditors' committee has been appointed in these Chapter 11 Cases. Notice of this Motion has been given to (a) the Office of the U.S. Trustee; (b) the Debtors' material prepetition and postpetition secured lenders or any agent therefore; (c) counsel for 1199 SEIU National Benefit Fund for Health and Human Service Employees (d) the Office of the United States Attorney; (e) the Office of the New York State Attorney General; (f) the New York State Department of Health; (g) the Internal Revenue Service; and (h) the holders of the 30 largest unsecured claims on a consolidated basis. The Debtors submit that no other notice need be given.

50) No previous application for the relief sought herein has been made to this or any other Court.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

**WHEREFORE**, the Debtors respectfully requests that the Court (a) enter an Order approving the Credit Agreement Documents, substantially in the form attached hereto as **Exhibit A**, authorizing the Credit Agreement, and (b) grant the Debtors such other and further relief as may be just and appropriate under the circumstances.

Dated: New York, New York
September 19, 2011

ABRAMS FENSTERMAN, *ET AL*.,

By: /s/ Deborah J. Piazza_____
Deborah J. Piazza
Danielle Elias, Esq.
Abrams Fensterman, *et al.*
630 Third Avenue, 5th Floor
New York, NY 10017
Tel: (212) 279-9200
Fax: (212) 279-0600
dpiazza@abramslaw.com
Delias@abramslaw.com

*Proposed Counsel for Debtors
and Debtors in Possession*