**CREDIT AND SECURITY AGREEMENT**

**DATED AS OF SEPTEMBER 19, 2011**

**by and between**

**PENINSULA HOSPITAL CENTER AND PENINSULA CENTER FOR EXTENDED CARE AND REHABILITATION,**

**as Borrower**

**and**

**REVIVAL FUNDING CO., LLC,**

**as Lender**

**POST-PETITION CREDIT AND SECURITY AGREEMENT**

This POST-PETITION CREDIT AND SECURITY AGREEMENT is dated as of September 19, 2011, and is entered into by and between Peninsula Hospital Center and Peninsula Center for Extended Care and Rehabilitation, New York not-for-profit corporations (together, the "Borrower"), and Revival Funding Co, LLC, a New York limited liability company ("Lender").

**R E C I T A L S :**

WHEREAS, on September 19, 2011 (the "Petition Date"), Borrower filed a voluntary petition with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") commencing a case under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case");

WHEREAS, Borrower continues to operate its business and manage its properties as a debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Borrower has requested that Lender provide a debtor-in-possession credit facility in an aggregate amount of up to $8,000,000;

WHEREAS, Borrower intends to utilize such funds primarily to fund payroll expenses and day-to-day operations of Borrower during the pendency of the Chapter 11 Case;

WHEREAS, Borrower desires to secure all of its Obligations under the Loan Documents by granting to Lender a security interest in and lien upon substantially all of Borrower's existing and after-acquired personal and real property;

WHEREAS, Borrower and Lender are parties to a Collateral Sharing Agreement together with certain union benefit funds (the "Benefit Funds") identified in the Collateral Sharing Agreement

WHEREAS, all capitalized terms herein shall have the meanings ascribed thereto in **Annex A** hereto, which is incorporated herein by reference.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions, and covenants herein contained, Borrower and Lender agree as follows:

**SECTION 1.**
**AMOUNTS AND TERM OF LOANS**

1.1.    Loans.    Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of Borrower:

(a)    Credit Advances.    Lender agrees to make available to Borrower from time to time until the Maturity Date advances (each a "Credit Advance") requested by Borrower Representative on behalf of Borrower hereunder up to, as of any date, $8,000,000 (the "Line of Credit Amount"); All outstanding Credit Advances and other Obligations shall be repaid in full

on or before the Maturity Date. Written notices for funding requests shall be in the form attached hereto as **Exhibit 1**. Lender shall have no obligation to make any Credit Advances (i) after being notified by the Benefit Funds that the Debtors have failed to make payments as required by the Collateral Sharing Agreement or if the Collateral Sharing Agreement has terminated.

(b) <u>Funding Authorization</u>. The proceeds of all Credit Advances made pursuant to this Agreement are to be funded by Lender by wire transfer to an account designated in writing by Borrower Representative on behalf of Borrower within one business day of receipt by Lender of any such request for Credit Advance.

1.2. <u>Payments</u>. All payments by Borrower of the Obligations shall be without deduction, defense, setoff, or counterclaim and shall be made and delivered to Lender by wire transfer to such account as Lender may designate in writing. Borrower shall receive credit on the day of receipt for funds received by Lender by 2:00 p.m. (New York time). In the absence of timely receipt, such funds shall be deemed to have been paid on the next Business Day. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the payment may be made on the next succeeding Business Day and such extension of time shall be included in the computation of the amount of interest due hereunder.

1.3. <u>Interest and Payments</u>.

(a) Except as otherwise provided herein, all payments by Borrower of the Obligations hereunder shall bear interest to Lender in an amount equal to six percent (6%) per annum.

(b) So long as an Event of Default has occurred and is continuing under **Section 5.1(a)** and without notice of any kind, the interest rates applicable to the Obligations shall be increased to nine percent (9%) per annum ("<u>Default Rate</u>"),

(c) All computations of interest shall be made by Lender on the basis of a 360-day year, based on the actual number of days occurring in the period for which such interest is payable. The determination by Lender of the interest rate and interest due hereunder shall be final, binding, and conclusive on Borrower, absent manifest error.

1.4. <u>Origination Fee</u>. Borrower shall not be obligated to pay a loan origination fee or any other fees except as specifically set forth herein.

1.5. <u>Maturity Date</u>. All of the Obligations shall become due and payable upon the earlier of (i) 30 days from the commencement of the case if the Bankruptcy Court has failed to enter (A) an order approving the agreement between Borrower and Revival Acquisition Group LLC ("Revival") dated September 1, 2011 or (B) the Final Order, (ii) two (2) years from the date of this Agreement, (iii) upon the appointment of a trustee, receiver or any court appointed Person which shall divest the New Directors or Todd Miller as Chief Restructuring Officer of control over the operations and/or finances of Borrower, or (iv) the confirmation by the Bankruptcy Court of a Plan of Reorganization not proposed by Revival (the "<u>Maturity Date</u>"). Until all Obligations have been fully paid and satisfied, Lender shall be entitled to retain the security interests in the Collateral granted hereunder and shall have the ability to exercise all

rights and remedies available to it under the Loan Documents and applicable law. Notwithstanding anything contained herein to the contrary, Borrower may prepay the obligations at any time without penalty.

1.6.    Loan Accounts.  Lender shall maintain a loan account (the "Loan Account") on its books to record: all Credit Advances, all payments made by Borrower, and all other debits and credits as provided in this Agreement with respect to the Obligations.  All entries in the Loan Account shall be made in accordance with Lender's customary accounting practices as in effect from time to time.  The balance in the Loan Account, as recorded on Lender's most recent printout or other written statement shall, absent manifest error, be presumptive evidence of the amounts due and owing to Lender by Borrower; provided that any failure to so record or any error in so recording shall not limit or otherwise affect Borrower's duty to pay the Obligations. Lender shall provide Borrower with a copy of the Loan Account or a summary thereof each month.

1.7.    No Deductions.  Any and all payments or reimbursements made hereunder shall be made free and clear of and without deduction for any and all charges, taxes, levies, imposts, deductions, or withholdings, and all liabilities with respect thereto of any nature whatsoever imposed by any taxing authority.  If Borrower shall be required by law to deduct any such amounts from or in respect of any sum payable hereunder to Lender, then the sum payable hereunder shall be increased as may be necessary so that, after making all required deductions, Lender receives an amount equal to the sum it would have received had no such deductions been made.

1.8.    Superpriority; Nature of Obligations and Lender's Liens.

(a)    The priority of Lender's Liens on the Collateral shall be set forth in any Interim Order and the Final Order, as applicable.

(b)    Except as otherwise may be provided in the Interim Order or the Final Order or the Collateral Sharing Agreement, all Obligations shall constitute administrative expenses of Borrower in the Chapter 11 Case, with administrative priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code; provided, however, that Lender's security interests and liens on the Collateral shall be subject and subordinate only to the following: (i) payment of United States Trustee's fees pursuant to 28 U.S.C. §1930(a)(6) plus interest at the statutory rate for any fees not paid in a timely manner, and any fees payable to the Clerk of the Bankruptcy Court; (ii) fees and expenses of attorneys, accountants and other professionals retained in the Chapter 11 cases, to the extent allowed by the Bankruptcy Court, but in no event to exceed $500,000.00; and (iii) reasonable fees and expenses of a Chapter 7 trustee allowable pursuant to 11 U.S.C. §726(b) in an amount not to exceed $15,000.00 (items (i), (ii), and (iii), collectively, the "Carve Out").  The administrative expense claims based upon the Obligations shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of Borrower, Borrower's estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code, subject only to payment of all

United States Trustee quarterly fees required to be paid by 28 U.S.C. §1930(a)(6) and any applicable interest thereon.

## SECTION 2.
## AFFIRMATIVE COVENANTS

Borrower agrees that from and after the date hereof until the Termination Date:

2.1.    <u>Compliance With Laws and Contractual Obligations</u>.  Borrower will (a) comply with (i) the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority (including, without limitation, laws, rules, regulations, and orders relating to taxes, employer and employee contributions, securities, employee retirement and welfare benefits, environmental protection matters, and employee health and safety) as now in effect and which may be imposed in the future in all jurisdictions in which Borrower is now doing business or may hereafter be doing business and (ii) the obligations, covenants, and conditions contained in all Contractual Obligations of Borrower other than those laws, rules, regulations, orders, and provisions of such Contractual Obligations (A) that are not enforceable without an order of the Bankruptcy Court or (B) the noncompliance with which could not be reasonably expected to have a Material Adverse Effect, and (b) maintain or obtain all licenses, qualifications, and permits now held or hereafter required to be held by Borrower, for which the loss, suspension, revocation, or failure to obtain or renew could reasonably be expected to have a Material Adverse Effect.

2.2.    <u>Insurance; Damage to or Destruction of Collateral</u>.  Borrower shall, at its sole cost and expense, maintain the policies of insurance as in effect on the date hereof or otherwise in form and amounts and with insurers reasonably acceptable to Lender.  Borrower shall deliver to Lender, in form and substance reasonably satisfactory to Lender, endorsements to or assignments of (i) all "All Risk" and business interruption insurance naming Lender, on behalf of itself and Lender, as loss payee or assignee, and (ii) all general liability and other liability policies naming Lender as additional insured.  Within one (1) Business Day thereof, Borrower shall provide Lender with written notice of any failure by Borrower to pay any insurance premiums on a timely basis and with copies of any notices it receives regarding the potential or actual non-renewal, cancellation, or amendment of any insurance policy.

2.3.    <u>Inspection</u>.  Borrower shall permit any authorized representatives of Lender to visit, audit, and inspect any of the properties of Borrower, including its financial and accounting records, and to make copies and take extracts therefrom, and to discuss its affairs, finances, and business with it and its officers, attorneys, and accountants upon prior notice and at such reasonable times during normal business hours and as often as may be reasonably requested.

2.4.    <u>Conduct of Operations</u>.  Borrower shall at all times maintain, preserve, and protect all of its assets and properties used or useful in the conduct of its operations, and keep the same in good repair, working order, and condition in all material respects (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements, and improvements thereto consistent with industry practices and continue to conduct its operation substantially as now conducted (taking into account, as appropriate, Borrower's status as a debtor-in-possession under the Bankruptcy

5

Code, including its right to reject executory contracts and unexpired leases thereunder), and transact business only under its existing corporate names.

2.5.    Further Assurances.  Borrower shall, from time to time, execute or authorize the execution of such financing statements, documents, control agreements, security agreements, and reports as Lender at any time may reasonably request to evidence, perfect, or otherwise implement the security for repayment of the Obligations contemplated by the Loan Documents.

## SECTION 3.
## NEGATIVE COVENANTS

Borrower agrees that from and after the date hereof until the Termination Date:

3.1.    Post-Petition Date Indebtedness.  Borrower shall not directly or indirectly create, incur, assume, or otherwise become or remain directly or indirectly liable with respect to any Post-Petition Date Indebtedness, except with respect to (i) the Obligations, (ii) Post-Petition Date indebtedness not to exceed $5,000,  (iii) Post-Petition Date past due indebtedness on account of professional fees incurred under Section 330 of the Bankruptcy Code or required to be paid by 28 U.S.C. § 1930(a)(6) and any applicable interest thereon (iv) Post-Petition Indebtedness to the Benefit Funds in the Agreement Period

3.2.    Liens and Related Matters.

(a)    No Post-Petition Date Liens.  Borrower shall not directly or indirectly create, incur, assume, or permit to exist any Lien (on than in favor of Lender) on or with respect to any property or asset of Borrower, whether now owned or hereafter acquired, or any income or profits therefrom.

(b)    No Negative Pledges.  Borrower shall not directly or indirectly enter into or assume any agreement prohibiting the creation or assumption of any Lender Lien upon its properties or assets, whether now owned or hereafter acquired.

3.3.    Restriction on Fundamental Changes.  Subject to the Bankruptcy Code and any orders of the Bankruptcy Court, including any confirmation order, Borrower shall not and shall not directly or indirectly: (a) amend, modify, or waive any term or provision of its organizational documents, including its articles of incorporation, by-laws, or operating agreement unless required by law; (b) enter into any transaction of merger or consolidation; (c) liquidate, wind-up, or dissolve itself (or suffer any liquidation or dissolution); (d) acquire by purchase or otherwise all or any substantial part of the business or assets of any other Person; (e) establish an Affiliated entity; or (f) change its name, identity, or corporate structure.

3.4.    Conduct of Business.  Borrower shall not directly or indirectly engage in any business other than the business in which it is currently engaged.

3.5.    Press Releases.  Neither Borrower nor its Affiliates shall issue any press releases using Lender's name or the names of Lender's affiliates or principals without Lender's prior written consent.

3.6.    <u>Bank Accounts</u>.  Borrower shall not establish any new bank accounts without prior written notice to Lender.

3.7.    <u>Material Contracts</u>.  Borrower shall not change or amend the terms of any of the material contracts or agreements, or enter into any new material contracts or agreements, without Lender's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned.

3.8.    <u>Repayment of Indebtedness</u>.  Except pursuant to a confirmed reorganization plan, Borrower shall not, without the express prior written consent of Lender or pursuant to an order of the Bankruptcy Court after notice and hearing, make any payment or transfer with respect to any Lien or indebtedness incurred or arising prior to the filing of the Chapter 11 Case that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise, including making any "cure" payments pursuant to Section 365 of the Bankruptcy Code or payments pursuant to Section 503(b)(9) of the Bankruptcy Code.

3.9.    <u>Reclamation Claims</u>.  Borrower shall not enter into any agreement to return any of its Inventory to any of its creditors for application against any pre-Petition Date indebtedness, pre-Petition Date trade payables, or other pre-Petition Date claims or allow any creditor to take any setoff or recoupment against any of its pre-Petition Date indebtedness, pre-Petition Date trade payables, or other pre-Petition Date claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise.

3.10.   <u>Chapter 11 Claims</u>.  Borrower shall not incur, create, assume, suffer to exist, or permit any other superpriority administrative claim which is <u>pari</u> <u>passu</u> with or senior to the claims of Lender against Borrower; <u>provided, however</u>, that Lender's security interests and liens on the Collateral shall be subject and subordinate only to the Carve Out.

## SECTION 4.
## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and to make Credit Advances, Borrower represents, warrants, and covenants to Lender that the following statements are, and will be, true, correct, and complete until the Termination Date:

4.1.    <u>Disclosure</u>.  No representation or warranty of Borrower contained in this Agreement or any other document, certificate, or written statement furnished to Lender by or on behalf of Borrower contains any untrue statement of a material fact or omitted, omits, or will omit to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made.

4.2.    <u>No Material Adverse Effect</u>.  Since the Petition Date, there have been no events or changes in facts or circumstances affecting Borrower which have had or could reasonably be expected to have a Material Adverse Effect and that have not been disclosed to Lender.

4.3.    <u>No Conflict</u>.  The consummation of the transactions described in the Loan Documents does not and will not violate or conflict with any laws, rules, regulations, or orders of

any Governmental Authority or violate, conflict with, result in a breach of, or constitute a default under any Contractual Obligation or organizational documents of Borrower.

4.4.     <u>Organization and Powers</u>.  Borrower is duly organized, validly existing, and in good standing under the laws of New York.  Borrower has all requisite organizational power and authority to own and operate its properties, to carry on its business as now conducted and proposed to be conducted, to enter into the Loan Documents to which it is a party, and to incur the Obligations, grant liens and security interests in the Collateral, and carry out the transactions described in the Loan Documents.

4.5.     <u>Binding Obligations</u>.  This Agreement is, and the other Loan Documents when executed and delivered will be, legally valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms upon order of the Bankruptcy Court.

4.6.     <u>Investigations, Audits, Etc</u>.  Borrower is not, to the best of its knowledge, the subject of any review or audit by the IRS or any governmental investigation concerning the violation or possible violation of any law.

4.7.     <u>Litigation; Adverse Facts</u>.  Except as set forth in Schedule __ hereto, there are no judgments outstanding against Borrower  or affecting any property of Borrower, nor is there any Litigation pending, or to the best knowledge of Borrower threatened, against Borrower which could reasonably be expected to result in any Material Adverse Effect.

4.8.     <u>Use of Proceeds</u>.  Borrower shall utilize the proceeds of the Credit Advances solely for the purpose of funding Borrower's post-petition operations, including, without limitation, payroll expenses and outstanding post-petition creditor obligations, and only in accordance with the budget annexed hereto as Schedule__.

4.9.     <u>Liens</u>.  Except as set forth in Schedule __ hereto, none of the properties and assets of Borrower are subject to any Liens other than Liens in favor of Lender and the liens set forth in the UCC search report provided by Borrower to counsel for Lender on [ ], and there are no facts, circumstances, or conditions known to Borrower that may result in any Liens against the properties or assets of Borrower.

4.10.     <u>Brokers</u>.  No broker or finder acting on behalf of Borrower or any Affiliate thereof brought about the obtaining, making, or closing of this Agreement, and neither Borrower nor any Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

4.11.     <u>Compliance with Laws and Contractual Obligations</u>.  To the best of Borrower's knowledge, Borrower is in compliance with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority and the obligations, covenants, and conditions contained in all Contractual Obligations other than those laws, rules, regulations, orders, and provisions of such Contractual Obligations the noncompliance with which could not be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect.

# SECTION 5.
## DEFAULT, RIGHTS, AND REMEDIES

5.1. <u>Event of Default</u>. "Event of Default" shall mean the occurrence or existence of any one or more of the following:

      (a)    <u>Payment</u>. Following two Business Day's written notice to Borrower and corresponding opportunity to cure, (i) Borrower fails to pay any payment of principal or interest with respect to any Credit Advance when due or (ii) fails to pay or reimburse Lender any expense payable or reimburseable by Borrower hereunder or under any other Loan Document when due;

      (b)    <u>Other Defaults Under Loan Documents</u>. Borrower defaults and has failed to cure such default within three (3) business days of notice of such default in the performance of or compliance with any term, including any covenant, condition, representation, warranty, or certification, contained in this Agreement or in the other Loan Documents;

      (c)    <u>Default in Other Agreements</u>. After any applicable grace or cure period, if any: (i) Borrower fails to pay when due any principal or interest on Post-Petition Date indebtedness to a third party or (ii) Borrower breaches or defaults, or there occurs any condition or event, with respect to any Post-Petition Date indebtedness to a third party, if the effect of such breach, default, occurrence, or event is to cause, or to permit the holder or holders then to cause, such Post-Petition Date indebtedness to become or be declared due prior to its stated maturity; or

      (d)    <u>Related to the Chapter 11 Case</u>. The occurrence of any of the following in the Chapter 11 Case:

      (i)    the bringing of a motion (or the support thereof), taking of any action, or the filing of any plan of reorganization or disclosure statement attendant thereto by Borrower:  (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement (other than with respect to a financing used, in whole or in part, to repay in full the Obligations); (B) to grant any Lien affecting any Collateral except as permitted hereby; (C) to use cash collateral of Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of Lender; or (D) to authorize any other action or actions adverse to Lender or its rights and remedies hereunder or its interests in the Collateral that would, individually or in the aggregate, have a Material Adverse Effect.

      (ii)    the filing of any plan of reorganization or disclosure statement attendant thereto by a Borrower or any other Person that does not contain a provision for and repayment in full in cash of all of the Obligations under this Agreement ten days following the entry of an order confirming such plan;

      (iii)    the entry of an order in the Chapter 11 Case confirming a plan or plans of reorganization that does not contain a provision for repayment in full in cash of all of the Obligations under this Agreement ten days following the entry of an order confirming such plan;

      (iv)    the entry of an order amending, supplementing, staying, vacating, or otherwise modifying the Loan Documents or any Interim Order (in the event that the

Bankruptcy Court holds a separate hearing on the motion seeking authority to enter into the Loan Documents on an interim basis) or the Final Order without the written consent of Lender or the filing of a motion for reconsideration with respect to any Interim Order (if applicable) or the Final Order;

(v)     the Final Order is not entered immediately following the expiration of any Interim Order (in the event that the Bankruptcy Court holds a separate hearing on the motion seeking authority to enter into the Loan Documents on an interim basis);

(vi)     the appointment of an interim or permanent trustee or an examiner with expanded powers to operate or manage the financial affairs, the business, or reorganization of Borrower; or the sale without Lender's consent, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan or reorganization in any of the Chapter 11 Case, or otherwise that does not provide for repayment in full in cash of all of the Obligations under this Agreement;

(vii)     the dismissal of the Chapter 11 Case or the conversion of the Chapter 11 Case to one under Chapter 7 of the Bankruptcy Code or filing of a motion by Borrower seeking any such relief;

(viii)     the entry of an order by the Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

(ix)     the failure in any material respect of Borrower to perform any of its obligations under any Interim Order (in the event that the Bankruptcy Court holds a separate hearing on the motion seeking authority to enter into the Loan Documents on an interim basis) or the Final Order; or

(x)     the entry of an order granting any other super priority administrative claim or Lien equal or superior to that granted to Lender.

(e)     <u>Invalidity of Loan Documents</u>.  Any of the Loan Documents for any reason, other than a partial or full release in accordance with the terms thereof, ceases to be in full force and effect or is declared to be null and void, or Borrower denies that it has any further liability under any Loan Documents to which it is party, or gives notice to such effect;

(f)     <u>Cessation of Business Activities</u>.  Any event occurs, whether or not insured or insurable, as a result of which Borrower's revenue-producing activities cease or are substantially curtailed for more than 30 days; or

(g)     <u>Change of Control</u>.  A change of control of either Borrower occurs, other than the appointment of the New Directors.

5.2.    Suspension or Termination of Obligations.  Upon the occurrence of any Event of Default, Lender may immediately suspend all or any portion of its obligations to make Credit Advances.

5.3.    Acceleration and other Remedies.  Upon the occurrence and during the continuance of any Event of Default, Lender may, by written notice to Borrower Representative, declare all or any portion of the Credit Advances and the other Obligations to be, and the same shall forthwith become, immediately due and payable together with accrued interest thereon and exercise any other remedies which may be available under the Loan Documents or applicable law.

5.4.    Application of Proceeds.  Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence of an Event of Default, Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by Lender from or on behalf of Borrower, and Lender shall have the continuing and exclusive right to apply and to reapply any and all payments received at any time or times after the occurrence and during the continuance of an Event of Default against the Obligations in such manner as Lender may deem advisable notwithstanding any previous application by Lender.

5.5.    Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence of an Event of Default, Borrower, at its own expense, upon the written request of Lender, shall (A) cause to be delivered to Lender an appraisal or valuation, as the case may be, performed by an independent appraiser acceptable to Lender, of any or all of the Collateral, and/or (B) permit Lender to perform audits of Borrower's accounts, at such times as Lender shall require.

## SECTION 6.
## CONDITIONS TO CREDIT ADVANCES

6.1.    Conditions to All Credit Advances.  Lender shall not be obligated to make any Credit Advance on any date (a "Funding Date"):

(a)    unless and until the Bankruptcy Court has entered an Interim Order (in the event that the Bankruptcy Court holds a separate hearing on the motion seeking authority to enter into the Loan Documents on an interim basis) or the Final Order, as the case may be, in the form and substance substantially as set forth in Exhibit A;

(b)    if any material representation or warranty by Borrower contained herein or in any other Loan Document is untrue or incorrect in any material respect as of such date;

(c)    if any Event of Default has occurred or would result after giving effect to any Credit Advance;

(d)    unless and until insurance covering liability of directors and officers is in full force and effect in the amounts set forth in directors and officers insurance policy in effect as of the date this Agreement is executed for each of the individual entities that together comprise the Borrower [subject to verifying amount].

The request and acceptance by Borrower of the proceeds of any Credit Advance shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by Borrower that the conditions in this **Section 6.1** have been satisfied and (ii) the granting and continuance of Lender's Liens pursuant to this Agreement.

**SECTION 7.**
**MISCELLANEOUS**

7.1.    <u>Indemnities</u>.  Borrower agrees to indemnify, pay, and hold Lender and its officers, directors, employees, agents, financial advisors, and attorneys (the "<u>Indemnitees</u>") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, and expenses (including all reasonable fees and expenses of counsel to such Indemnitees) of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Indemnitee as a result of such Indemnitee being a party to this Agreement or the transactions consummated pursuant to this Agreement; <u>provided</u>, that Borrower shall have no obligation to an Indemnitee hereunder with respect to liabilities to the extent resulting from the gross negligence or willful misconduct of that Indemnitee as determined by a final, non-appealable order of a court of competent jurisdiction.  If and to the extent that the foregoing undertaking may be unenforceable for any reason, Borrower agrees to make the maximum contribution to the payment and satisfaction to all Indemnitees which is permissible under applicable law.

7.2.    <u>Amendments and Waivers</u>.  No amendment, modification, termination, or waiver of any provision of this Agreement or any other Loan Document, or any consent to any departure by Borrower therefrom, shall be effective unless the same shall be in writing and signed by Borrower and Lender.

7.3.    <u>Notices</u>.  Any notice or other communication required shall be in writing addressed to the respective party as set forth below and may be personally served, telecopied, sent by overnight courier service or U.S. mail or e-mail and shall be deemed to have been given: (a) if delivered in person, when delivered; (b) if delivered by fax or e-mail, on the date of transmission if transmitted on a Business Day before 4:00 p.m. New York Time; (c) if delivered by overnight courier, one (1) Business Day after delivery to the courier properly addressed; or (d) if delivered by U.S. mail, three (3) Business Days after deposit with postage prepaid and properly addressed.

Notices shall be addressed as follows:

| | |
|---|---|
| If to Borrower or Borrower Representative: | PENINSULA |
| | 51-15 Beach Channel Drive |
| | Far Rockaway, N.Y. 11691 |
| | ATTN:  Todd Miller] |
| | Fax:  718-734-2993 |
| | Email:  todd.miller@peninsulahospital.org |
| | |
| With a copy to: | Abrams Fensterman, *et al.* |
| | 630 Third Ave., Fifth Floor |

New York, NY 10017
Attn: Deborah Piazza, Esq.

If to Lender:            Isaac Soskin,
Revival Funding Co., LLC
5350 Kings Highway
Brooklyn N.Y. 11203
Email: ISoskin@revivalhhc.org

With a copy to:        NUTOVIC & ASSOCIATES
488 Madison Avenue, 16th Floor
New York, New York 10022
ATTN: Isaac Nutovic, Esq.
Fax: (212) 421-8618
Email: inutovic@nutovic.com

7.4. _Failure or Indulgence Not Waiver; Remedies Cumulative_. No failure or delay on the part of Lender to exercise, nor any partial exercise of, any power, right, or privilege hereunder or under any other Loan Documents shall impair such power, right, or privilege or be construed to be a waiver of any Event of Default. All rights and remedies existing hereunder or under any other Loan Document are cumulative to and not exclusive of any rights or remedies otherwise available.

7.5. _Severability_. The invalidity, illegality, or unenforceability in any jurisdiction of any provision under the Loan Documents shall not affect or impair the remaining provisions of the Loan Documents.

7.6. _Headings_. Section and subsection headings are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purposes or be given substantive effect.

7.7. _Applicable Law_. THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS WHICH DOES NOT EXPRESSLY SET FORTH APPLICABLE LAW SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED, AS APPLICABLE, IN ACCORDANCE WITH THE BANKRUPTCY CODE AND THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.

7.8. _Successors and Assigns_. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns except that Borrower may not assign its rights or obligations hereunder without the written consent of Lender.

7.9. _No Fiduciary Relationship; Limited Liability_. No provision in the Loan Documents and no course of dealing between the parties shall be deemed to create any fiduciary duty owing to Borrower by Lender. Borrower agrees that Lender shall not have liability to Borrower (whether sounding in tort, contract, or otherwise) for losses suffered by Borrower in connection with, arising out of, or in any way related to the transactions contemplated and the

relationship established by the Loan Documents, or any act, omission, or event occurring in connection therewith, unless and to the extent that it is determined that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought as determined by a final, non-appealable order by a court of competent jurisdiction. Lender shall not have any liability with respect to, and Borrower hereby waives, releases, and agrees not to sue for, any special, indirect, or consequential damages suffered by Borrower in connection with, arising out of, or in any way related to the Loan Documents or the transactions contemplated thereby.

7.10. <u>Construction</u>. Each of Lender and Borrower acknowledges that it has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review the Loan Documents with its legal counsel and that the Loan Documents shall be construed as if jointly drafted by Lender and Borrower.

7.11. <u>WAIVER OF JURY TRIAL</u>. BORROWER HEREBY WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. BORROWER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO LENDER TO ENTER INTO THIS AGREEMENT, THAT LENDER HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND THAT LENDER WILL CONTINUE TO RELY ON THE WAIVER IN ITS RELATED FUTURE DEALINGS WITH BORROWER. BORROWER WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY TO REVIEW THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

7.12. <u>Survival of Warranties and Certain Agreements</u>. All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement and the making and repayment of any Credit Advances. Notwithstanding anything in this Agreement or implied by law to the contrary, the agreements of Borrower set forth in **Sections 7.1 and 9.2** shall survive the repayment of the Obligations and the termination of this Agreement for a period of eight (8) years.

7.13. <u>Entire Agreement</u>. This Agreement and the other Loan Documents embody the entire agreement among the parties hereto and supersede all prior commitments, agreements, representations, and understandings, whether oral or written, relating to the subject matter hereof, and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto. All exhibits, schedules, and annexes referred to herein are incorporated in this Agreement by reference and constitute a part of this Agreement.

7.14. <u>Counterparts; Effectiveness</u>. This Agreement and any amendments, waivers, consents, or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts together shall constitute but one in the same instrument. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto.

7.15.   <u>Waivers by Borrower</u>.  Borrower expressly waives all rights it may have now or in the future under any statute, or at common law, or at law or in equity, or otherwise, to compel Lender to marshal assets or to proceed in respect of the Obligations hereunder or to subrogation, reimbursement, exoneration, contribution, indemnification, or set off and any and all defenses available to a surety, guarantor, or accommodation co-obligor.

7.16.   <u>Election of Remedies</u>.  If Lender may, under applicable law, proceed to realize its benefits under any of the Loan Documents giving Lender a Lien upon any Collateral, Lender or Lender may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its other rights and remedies hereunder.

**SECTION 8.**
**SECURITY INTEREST**

8.1.   <u>Security Interest</u>.  To secure the payment, observance and performance of the Obligations, Borrower hereby mortgages, pledges and assigns all of the Collateral of Borrower, including, without limitation, all of Borrower's Accounts and Inventory and any proceeds therefrom, to Lender and grants to Lender a continuing first priority security interest in, and a continuing Lien upon, the Collateral; <u>provided</u>, however, that such security interests and liens shall be subordinate to the Carve Out.

8.2.   <u>Continued Priority of Security Interest</u>.

(a)   The security interest granted by Borrower shall at all times be valid, perfected, and enforceable against Borrower and all third parties in accordance with the terms of this Agreement, as security for the Obligations, and the Collateral shall not at any time be subject to any Liens that are prior to, on a parity with, or junior to the Security Interest; <u>provided</u>, however, that such security interests in and liens shall be subordinate to the Carve Out.

(b)   Borrower shall, at its cost and expense, take all action that may be necessary or desirable, or that Lender may reasonably request, so as at all times to maintain the validity, perfection, enforceability, and rank of the security interest in the Collateral in conformity with the requirements of **Section 8.2(a)**, to enable Lender to exercise or enforce its rights hereunder, and to obtain the full benefits of this Agreement including, but not limited to:

(i)   paying all taxes, assessments, and other claims lawfully levied or assessed on any of the Collateral;

(ii)   delivering to Lender endorsed or accompanied by such instruments of assignment as Lender may specify, and stamping or marking, in such manner as Lender may specify, any and all Chattel Paper, Instruments, and Documents evidencing or forming a part of the Collateral; and

(iii)   executing, delivering, and filing financing statements, pledges, designations, hypothecations, notices, and assignments in each case in form and substance satisfactory to Lender relating to the creation, validity, perfection, maintenance, or continuation of the security interest under the Code or other applicable law.

(c)     Lender is hereby authorized to file one or more financing or continuation statements or amendments thereto without the signature of or in the name of Borrower for any purpose described in **Section 8.2(b)**, including, without limitation, any such financing or continuation statements as Lender deems necessary in its sole discretion in order to comply with the Code in other jurisdictions where Collateral is located.  Lender will give Borrower notice of the filing of any such statements or amendments, which notice shall specify the locations where such statements or amendments were filed.  A carbon, photographic, xerographic, or other reproduction of this Agreement or of any of the Collateral Documents or of any financing statement filed in connection with this Agreement is sufficient as a financing statement.

## SECTION 9.
## COLLATERAL COVENANTS

Borrower agrees that as long as the Obligations remain outstanding:

### 9.1.     Maintenance of Records.

Borrower will keep and maintain, at its own cost and expense, satisfactory and complete records of the Collateral, in all material respects, including, without limitation, a record of all payments received and all credits granted with respect to the Collateral and all other dealings concerning the Collateral.  For Lender's further security, Borrower agrees that Lender shall have a property interest in all of Borrower's books and records pertaining to the Collateral and, upon the occurrence and during the continuation of an Event of Default, Borrower shall deliver and turn over copies of any such books and records to Lender or to its representatives at any time on written demand of  Lender.

### 9.2.     Indemnification With Respect to Collateral.

In any suit, proceeding or action brought by Lender relating to any Account, Chattel Paper, Contractual Obligations, General Intangible, Investment Property, Instrument, Intellectual Property, or other Collateral for any sum owing thereunder or to enforce any provision of any Account, Chattel Paper, Contractual Obligations, General Intangible, Investment Property, Instrument, Intellectual Property, or other Collateral, Borrower will save, indemnify, and hold harmless Lender and its officers, directors, employees, agents, financial advisors, and attorneys from and against all expense, loss, or damage suffered by Lender by reason of any defense, setoff, counterclaim, recoupment, or reduction of liability whatsoever of the obligor thereunder, arising out of a breach by Borrower of any obligation thereunder or arising out of any other agreement, indebtedness, or liability at any time owing to, or in favor of, such obligor or its successors from Borrower, and all such obligations of Borrower shall be and remain enforceable against and only against Borrower and shall not be enforceable against Lender.

### 9.3.     Limitation on Liens on Collateral.

Borrower will not create, permit, or suffer to exist, and will defend the Collateral against and take such other action as is necessary to remove, any Lien on the and will defend the right, title, and interest of Lender in and to all of Borrower's rights under the Chattel Paper, leasehold estates in real property of Borrower, as lessee (as such may be amended, supplemented, or otherwise modified from time to time), Real Estate, Contractual Obligations, Documents,

General Intangibles, Instruments, Investment Property and to the Intellectual Property, Accounts, Equipment, and Inventory and in and to the proceeds thereof against the claims and demands of all Persons whomsoever. Without limiting the foregoing, Borrower shall file an objection to any proof of claims filed it the Chapter 11 Case to the extent that Borrower determines, in its good faith judgment, that such claim was improperly filed as a secured claim.

9.4. Limitations on Modifications of Accounts.

Borrower will not, without Lender's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned, if the amount at issue is greater than $5,000, grant any extension of the time of payment of any of the Accounts, Chattel Paper, or Instruments, compromise, compound or settle the same for less than the full amount thereof, release, wholly or partly, any Person liable for the payment thereof, or allow any credit or discount whatsoever thereon other than any of the foregoing.

9.5. Notices.

Borrower will advise Lender promptly, in reasonable detail, (i) of any Lien asserted against any of the Collateral (other than a lien in favor of Lender), and (ii) of the occurrence of any other event which would result in a Material Adverse Effect with respect to the aggregate value of the Collateral or on the security interests created hereunder.

9.6. Maintenance of Equipment.

Borrower will keep and maintain the Equipment in good operating condition sufficient for the continuation of the business conducted by Borrower on a basis consistent with past practices, ordinary wear and tear excepted, except where the failure to so keep and maintain the Equipment would not, in the aggregate, have a Material Adverse Effect.

[*signature page to follow*]

Witness the due execution hereof by the respective duly authorized officers of the undersigned as of the date first written above.

PENINSULAHOSPITAL CORP and PENINSULA
GENERAL NURSING CORP.
as Borrower

By: _____
Name: _____
Title: _____


REVIVAL FUNDING CO., LLC
as Lender

By: _____
Name: _____
Title: _____

# ANNEX A
## to
## POST-PETITION CREDIT AND SECURITY AGREEMENT

### DEFINITIONS

Capitalized terms used in the Loan Documents shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings and all references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules or Annexes of or to the Agreement:

"Accounts" means all "accounts," as such term is defined in the Code, now owned or hereafter acquired by Borrower, including (a) all accounts receivable, other receivables, book debts, and other forms of obligations (other than forms of obligations evidenced by Chattel Paper or Instruments) (including any such obligations that may be characterized as an account or contract right under the Code), (b) all of Borrower's rights in, to, and under all purchase orders or receipts for goods or services, (c) all of Borrower's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation, and stoppage in transit and rights to returned, reclaimed, or repossessed goods), (d) all rights to payment due to Borrower for property sold, leased, licensed, assigned, or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by Borrower or in connection with any other transaction (whether or not yet earned by performance on the part of Borrower), and (e) all collateral security of any kind, now, or hereafter in existence, given by any Account Debtor or other Person with respect to any of the foregoing.

"Affiliate" means, with respect to any Person, (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian, or other fiduciary, 1% or more of the Stock having ordinary voting power in the election of directors or officers of such Person, (b) each Person that controls, is controlled by or is under common control with such Person, (c) each of such Person's officers, directors, joint venturers, and partners and (d) in the case of Borrower, the members of Borrower and their respective principals, directors, and officers. For the purposes of this definition, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise; provided, however, that the term "Affiliate" shall specifically exclude Lender.

"Agreement" means this Post-Petition Credit and Security Agreement (including all schedules, subschedules, annexes and exhibits hereto), as the same may be amended, supplemented, restated, or otherwise modified from time to time.

"Agreement Period" shall have the meaning ascribed to it in the Collateral Sharing Agreement.

"Bankruptcy Code" means the provisions of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. or other applicable bankruptcy, insolvency, or similar laws.

"Bankruptcy Court" has the meaning ascribed to it in the recitals of the Agreement.

"Benefit Funds" shall have the meaning ascribed to it in the Collateral Sharing Agreement.

"Borrower" has the meaning ascribed to it in the preamble to the Agreement.

"Borrower Representative" means Todd Miller.

"Borrowing Availability" means as of any date of determination the Line of Credit Amount less the aggregate amount of the Credit Advances then outstanding.

"Business Day" means any day that is not a Saturday, a Sunday, or a day on which banks are required or permitted to be closed in the State of New York.

"Carve Out" has the meaning ascribed to it in **Section 1.8**.

"Chapter 11 Case" has the meaning ascribed to it in the recitals of the Agreement.

"Chattel Paper" means any "chattel paper," as such term is defined in the Code, including electronic chattel paper, now owned or hereafter acquired by Borrower, wherever located.

"Code" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of New York; provided, that to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions related to such provisions.

"Collateral" means the property covered by the Collateral Documents and all other property and interests in property of Borrower's bankruptcy estate as defined or described pursuant to Section 541 of the Bankruptcy Code whether such property is, or interests in property are, now owned or hereafter acquired (excluding all claims and causes of action pursuant to, and all monies and other property of any kind and natures recovered by Borrower or any estate representative of Borrower in accordance with, the provisions of the Bankruptcy Code, including, without limitation, Section 544, 545, 546, 547, 548, 549, 550 and 553(b) thereof, or other applicable law), and in and to all of Borrower's, and its bankruptcy estate's, right, title and interest in and to all of its property and interests in property, whether real or personal, tangible or intangible, now existing or hereafter arising or acquired and wherever located, to secure the Obligations or any portion thereof. Collateral shall include, without limitation, all of Borrower's Accounts, Chattel Paper, Equipment, General Intangibles, Goods, Instruments, Intellectual Property, Inventory, Investment Property, and Stock and all Proceeds, all supporting obligations, and products of any and all of the foregoing.

"Collateral Documents" means those financing statements, mortgages, deeds of trust, notices of lien, certificates of title, or any other instruments and documents necessary to validate or perfect the respective liens and security interests granted to Lender pursuant to the Agreement, any Interim Order, and the Final Order, the execution and delivery of which shall not occur later than the ten (10) days after a request by Lender for delivery and execution of any one or more of the same.

"Collateral Sharing Agreement" means "The agreement between (i) Borrower,(ii) Lender and (iii) 1199 SEIU National Benefit Fund for Health and Human Service Employees, on behalf of itself and as collecting agent for 1199 SEIU Health Care Employees Pension Fund, League/1199 SEIU Training and Upgrading Fund, 1199 SEIU Employer Child Care Fund, and League/ 1199 SEIU Health Care Industry Job Security Fund,

"Contractual Obligations" means, as applied to any Person, any indenture, mortgage, deed of trust, contract, undertaking, agreement, or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"Copyright License" means any and all rights nor owned or hereafter acquired by Borrower under any written agreement granting any right to use any Copyright or Copyright registration.

"Copyrights" means all of the following now owned or hereafter adopted or acquired by Borrower: (a) all copyrights and General Intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings, and applications in the United States Copyright Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; and (b) all reissues, extensions or renewals thereof.

"Credit Advance" has the meaning ascribed to it in **Section 1.1(a)**.

"Default Rate" has the meaning ascribed to it in **Section 1.3(b)**.

"Documents" means any "document," as such term is defined in the Code, including electronic documents, now owned or hereafter acquired by Borrower, wherever located.

"Equipment" means all "equipment," as such term is defined in the Code, now owned or hereafter acquired by Borrower, wherever located and, in any event, including all Borrower's machinery and equipment, including processing equipment, conveyors, machine tools, data processing and computer equipment, including embedded software and peripheral equipment and all engineering, processing and manufacturing equipment, office machinery, furniture, materials handling equipment, tools, attachments, accessories, automotive equipment, trailers, trucks, forklifts, molds, dies, stamps, motor vehicles, rolling stock, and other equipment of every kind and nature, trade fixtures and fixtures not forming a part of real property, together with all additions and accessions thereto, replacements therefor, all parts therefor, all substitutes for any of the foregoing, fuel therefor, and all manuals, drawings, instructions, warranties, and rights

with respect thereto, and all products and proceeds thereof and condemnation awards and insurance proceeds with respect thereto.

"Event of Default" has the meaning ascribed to it in **Section 5.1**.

"Final Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedure as approved by the Court, which order shall be satisfactory in form and substance to Lender in its sole and absolute discretion, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed, or denied (unless Lender waives such requirement), together with all extensions, modifications, and amendments thereto, which, among other matters but not by way of limitation, authorizes, on a final basis, Borrower to execute and perform under this Agreement and the other Loan Documents, and which provides Lender with, subject only to the Carve-Out, a priming superpriority lien on all of the Collateral.

"Funding Date" has the meaning ascribed to it in **Section 6.1**.

"General Intangibles" means "general intangibles," as such term is defined in the Code, now owned or hereafter acquired by Borrower, including all right, title, and interest that Borrower may now or hereafter have in or under any Contractual Obligation, all payment intangibles, customer lists, Licenses, Copyrights, Trademarks, Patents, and all applications therefor and reissues, extensions or renewals thereof, rights in Intellectual Property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary, or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials, and records, goodwill (including the goodwill associated with any Trademark or Trademark License), all rights and claims in or under insurance policies (including insurance for fire, damage, loss and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, deposit, checking and other bank accounts, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged Stock and Investment Property, rights of indemnification, all books and records, correspondence, credit files, invoices and other papers, including all tapes, cards, computer runs, and other papers and documents in the possession or under the control of Borrower or any computer bureau or service company from time to time acting for Borrower.

"Goods" means any "goods," as such term is defined in the Code, now owned or hereafter acquired by Borrower, wherever located.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any agency, department, or other entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to government.

"Indemnitees" has the meaning ascribed to it in **Section 7.1**.

"Instruments" means all "instruments," as such term is defined in the Code, now owned or hereafter acquired by Borrower, wherever located, and, in any event, including all certificated securities, all certificates of deposit, and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Intellectual Property" means any and all Licenses, Patents, Copyrights, Trademarks, and the goodwill associated with such Trademarks.

"Interim Order" means any order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Lender in its sole and absolute discretion, which, among other matters but not by way of limitation, authorizes, on an interim basis, Borrower to execute and perform under this Agreement and the other Loan Documents, and which provides Lender with, subject only to the Carve-Out, a priming superpriority lien on all of the Collateral.

"Inventory" means any "inventory," as such term is defined in the Code, now owned or hereafter acquired by Borrower, wherever located, including inventory, merchandise, goods, and other personal property that are held by or on behalf of Borrower for sale or lease or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process, finished goods, returned goods, supplies, or materials of any kind, nature or description used or consumed or to be used or consumed in Borrower's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

"Investment Property" means all "investment property," as such term is defined in the Code, now owned or hereafter acquired by Borrower, wherever located, including: (i) all securities, whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnership interests, treasuries, certificates of deposit, and mutual fund shares; (ii) all securities entitlements of Borrower, including the rights of Borrower to any securities account and the financial assets held by a securities intermediary in such securities account and any free credit balance or other money owing by any securities intermediary with respect to that account; (iii) all securities accounts of Borrower; (iv) all commodity contracts of Borrower; and (v) all commodity accounts held by Borrower.

"IRS" means the Internal Revenue Service.

"Lender" has the meaning ascribed to it in the preamble to the Agreement.

"License" means any Copyright License, Patent License, Trademark License or other license of rights or interests now held or hereafter acquired by Borrower.

"Lien" means any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the

same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction).

"Line of Credit Amount" has the meaning ascribed to it in **Section 1.1(a)**.

"Litigation" means any action, charge, claim, demand, suit, proceeding, petition, governmental investigation, tax audit, or arbitration now pending or, to the best knowledge of Borrower after due inquiry, threatened against or affecting Borrower or any property of Borrower.

"Loan Account" has the meaning ascribed to it in **Section 1.6**.

"Loan Documents" means the Agreement, the Collateral Documents, and all other agreements, instruments, documents, and certificates executed and delivered to, or in favor of, Lender in connection with the Agreement or the transactions contemplated thereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits, or schedules thereto, and all amendments, restatements, supplements, or other modifications thereto, and shall refer to the Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects, or financial or other condition of Borrower, (b) Borrower's ability to pay any of the Credit Advances or any of the other Obligations in accordance with the terms of the Agreement, (c) the Collateral or Lender's Liens on the Collateral or the priority of such Liens, or (d) Lender's rights and remedies under the Agreement or the other Loan Documents.

"Maturity Date" has the meaning ascribed to it in **Section 1.5**.

"New Directors" means those Persons appointed to the Borrower's board of directors pursuant to the terms of that certain letter agreement dated Septemeber 1, 2011_____, 2011, by and between the Borrowers and Revival Acquistion Group LLC.

"Obligations" means all loans, advances, debts, liabilities, and obligations for the performance of covenants, tasks, or duties or for payment of monetary amounts and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement, or other instrument, arising under the Agreement or any of the other Loan Documents. This term includes all principal, interest, charges, expenses, and any other sum chargeable to Borrower under the Agreement or any of the other Loan Documents.

"Patent License" means rights under any written agreement now owned or hereafter acquired by Borrower granting any right with respect to any invention on which a Patent is in existence.

"Patents" means all of the following in which Borrower now holds or hereafter acquires any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or of any other country, including registrations, recordings, and applications in the United States Patent and

Trademark Office or in any similar office or agency of the United States, any State or any other country, and (b) all reissues, continuations, continuations-in-part, or extensions thereof.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity, or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body, or department thereof).

"Petition Date" has the meaning ascribed to it in the recitals of the Agreement.

"Post-Petition Date indebtedness" means, with respect to any Person, without duplication, indebtedness arising or incurred on or after the Petition Date.

"

"Stock" means all shares, options, warrants, general or limited partnership interests, membership interests, or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company, or equivalent entity whether voting or nonvoting, including common stock, preferred stock, or any other "equity security".

"Termination Date" means the date on which (a) the Credit Advances have been indefeasibly repaid in full, (b) all other Obligations under the Agreement and the other Loan Documents have been completely discharged, and (c) Borrower shall not have any further right to borrow any monies under the Agreement.

"Trademark License" means rights under any written agreement now owned or hereafter acquired by Borrower granting any right to use any Trademark.

"Trademarks" means all of the following now owned or hereafter adopted or acquired by Borrower: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, internet domain names, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings, and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all goodwill associated with or symbolized by any of the foregoing.

Rules of construction with respect to accounting terms used in the Agreement or the other Loan Documents shall be as set forth or referred to in this **Annex A**. All other undefined terms contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Code to the extent the same are used or defined therein; in the event that any term is defined differently in different Articles or Divisions of the Code, the definition contained in Article or Division 9 shall control. Unless otherwise specified, references in the Agreement or any of the Appendices to a Section, subsection, or clause refer to such Section, subsection, or clause as contained in the Agreement. The words "herein," "hereof" and

"hereunder" and other words of similar import refer to the Agreement as a whole, including any annexes, exhibits, and schedules, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection, or clause contained in the agreement or any such annex, exhibit, or schedule.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders. The words "including", "includes", and "include" shall be deemed to be followed by the words "without limitation"; the word "or" is not exclusive; references to Persons include their respective successors and assigns (to the extent and only to the extent permitted by the Loan Documents) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations. Whenever any provision in any Loan Document refers to the knowledge (or an analogous phrase) of Borrower, such words are intended to signify that Borrower has actual knowledge or awareness of a particular fact or circumstance or that Borrower, if it had exercised reasonable diligence, would have known or been aware of such fact or circumstance.

EXHIBIT 1
to
POST-PETITION CREDIT AND SECURITY AGREEMENT

FORM OF NOTICE OF CREDIT ADVANCE

_____, _____

[Address]


Regarding:      [Peninsula]


Ladies and Gentlemen:

The undersigned representative of [Borrower] refers to the Post-Petition Credit and Security Agreement, dated as of [ ] (the "Agreement," the terms defined therein being used herein as therein defined), and hereby provides Lender with notice pursuant to Section 1.1(a) of the Agreement that Borrower requests a Credit Advance under the Agreement, and in that connection sets forth below the information relating to such requested Credit Advance as required by Section 1.1(a) of the Credit Agreement:

(i)      The date of the requested Credit Advance is _____, _____.

(ii)      The aggregate amount of the requested Credit Advance is $_____.

(iii)      The requested Credit Advance is to be sent to:

          [Name of Bank]
          [City of Bank]
          Beneficiary:
          Account No.: [number]
          ABA No.: [number]
          Attn: [name].

(iv)      As of the date hereof, the outstanding Credit Advances (exclusive of interest)      is $_____.

(v)      As of the date hereof, the outstanding other Obligations is $_____.

(vi)      As of the date hereof, the Borrowing Availability is $_____.

The undersigned hereby certifies that all of the statements contained in this Notice of Credit Advance and in Section 6.1 of the Agreement are true and correct in all material respects on the date hereof, and will be true in all material respects on the date the requested Credit Advance is made, before and after giving effect thereto and to the application of the proceeds therefrom.

[PENINSULA]

By: _____
Name: _____
Title: _____