UNITED STATES BANKRUPTCY COURT          HEARING DATE: October 7, 2011
EASTERN DISTRICT OF NEW YORK            HEARING TIME:  9:30 a.m.
------------------------------------------------------- x
In re                                               :
                                                    :   Case No.11-47056-ess
PENINSULA HOSPITAL CENTER, *et al.*,                :
                                                    :   (Chapter 11)
                              Debtors.              :
                                                    :   (Jointly Administered)
------------------------------------------------------- x

## UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTORS' MOTION FOR AN ORDER AUTHORIZING DEBTORS TO OBTAIN SECURED POST-PETITION FINANCING ON A SUPER-PRIORITY SECURED BASIS

Tracy Hope Davis, the United States Trustee for Region 2 (the "United States Trustee"),

respectfully submits this objection (the "Objection") to the motion of Peninsula Hospital Center

("PHC") and Peninsula General Nursing Home Corp. ("PGN") (collectively, the "Debtors") for

an order, pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and Fed. R. Bankr. P. 2002, 4001 and

9014, authorizing the Debtors to obtain *inter alia* secured post-petition financing on a super-

priority secured basis (the "Motion").  In support of the Objection, the United States Trustee

represents and alleges as follows:

## I.    SUMMARY OF OBJECTION

The Debtors seek approval of three agreements related to proposed debtor in possession

financing from Revival Acquisition Group, LLC ("Revival"): (i) a credit and security agreement,

dated September 1, 2011 (the "Credit Agreement"), for an $8 million line of credit secured by a

priming lien on all of the Debtors' assets; (ii) a letter agreement, dated September 1, 2011 (the

"Letter Agreement"), which transfers control of the Debtors to Revival (collectively, the

"Agreements"); and (iii) a collateral sharing agreement, dated September 19, 2011 (the

"Collateral Sharing Agreement") between the Debtors, Revival and the 1199 SEIU Benefit

1

Funds (the "Benefit Funds"). The Court should deny the Motion.

The Agreements violate 11 U.S.C. § 364 because they divest the Debtors of control over their business operations and their ability to fulfill their duties as fiduciaries, and confer the benefits and protections of bankruptcy on Revival, rather than upon the Debtors, creditors and the estates. Under the Agreements, Revival takes control over the Debtors' board of directors, installs its employee as the chief executive, controls the Debtors' professionals, insulates itself from lien challenges and claims of any kind and dictates the terms of plans proposed by any other parties.

The Agreements also constitute a *sub rosa* plan that circumvents the disclosure statement and plan confirmation approval processes set forth in 11 U.S.C. §§ 1123, 1125, and 1129. In the context of debtor in possession financing, and at the very early stages of these cases, Revival's control of the Debtors and the terms of competing plans tip the balance of power to Revival to such an extraordinary extent that approval of the Agreements would inhibit meaningful negotiations with other creditors and parties in interest, potentially forcing them to accept courses of action or plan terms without recourse or risk implosion of the Debtors' cases.

The Court should deny approval of the Letter Agreement and consider the Credit Agreement and the Collateral Sharing Agreement under less onerous terms. Although the Debtors take aim to preserve the Debtors' operations for the benefit of the community, the transaction proposed is devoid of procedures reasonably intended to maximize the value of the estates. These goals are not mutually exclusive and the Debtors have multiple options under the Bankruptcy Code. Either an expedited plan process or a sale, transfer or use of property outside the ordinary course of business, with appropriate marketing and notice and subject to higher and

better offers under Section 363, would allow the Debtors to meet their goals through procedures that foster integrity of the process and the greatest return possible. Any failure to proceed in a manner that ensures that the Debtors realize the maximum value for the estates will call their business judgment into question. The Debtors have a duty to maximize value for the estates while they seek to meet the needs of the community at large.

## II. STATEMENT OF FACTS

### A. General Background

1.      On August 16, 2011, Wayne S. Dodakian, D.O., MedBiz, and Advanced Seamless Gutters (the "Petitioning Creditors") filed an involuntary chapter 11 petition against PHC. *See* ECF Doc. No. 1. On September 19, 2011, PHC consented to the entry of an order for relief, and on September 21, 2011, the Court entered an order for relief under chapter 11 in the PHC case pursuant to 11 U.S.C. § 303(h). *See* ECF Doc. Nos. 20 and 42.

2.      On September 19, 2011, PGN commenced its case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. *See* Case No. 11- 47985-ess, ECF Doc. No. 1.

3.      On September 19, 2011, the Debtors filed a motion for joint administration of their cases. *See* ECF Doc. No. 21. On September 20, 2011, the Court entered an order directing the procedural consolidation and joint administration of the cases. *See* ECF Doc. No. 38.

4.      PHC was founded in 1908 and is one of two hospitals located on the Rockaway Peninsula. *See* Declaration of Todd Miller ("Miller") (A) Pursuant to Local Bankruptcy Rule 1007-4, and (B) in Support of First Day Applications, executed on September 19, 2011, by Todd Miller (the "Miller Declaration") at 3, ¶ 6, ECF Doc. No. 22. PHC is a full service teaching

hospital with approximately 185 beds and resident training programs in orthopedics, general

surgery, family practice, dentistry and podiatry.  *Id*. at 11-12, § 11.  PGN is a skilled nursing

facility with 200 beds, specializing in a short term respiratory rehabilitation, and dementia,

hospice, long term and traumatic brain injury care.  *Id*. at 4, ¶ 12.

5.        Both PHC and PGN are New York 501(c)(3) not-for-profit corporations.  *Id*. at 3,

¶ 7.

6.        The Debtors are operating their businesses and managing their affairs as debtors

in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

7.        The United States Trustee has not appointed a trustee or an examiner in the cases.

8.        On August 24, 2011, the Court issued an order to show cause why the Court

should not direct the appointment of a patient care ombudsman ("PCO") for PCH.  *See* ECF Doc.

No. 10.  Following a hearing on September 13, 2011, the Court entered an Order directing the

appointment of the PCO.  *See* ECF Doc. No. 19.

9.        On September 22, 2011, the United States Trustee filed a notice of appointment of

Daniel T. McMurray as PCO for PCH (the "Ombudsman").  *See* ECF Doc. No. 55.

10.       On September 22, 2011, the United States Trustee, pursuant to 11 U.S.C. § 1102,

appointed an Official Committee of Unsecured Creditors (the "Committee").  *See* ECF Doc. No.

49.

**B.**      **Assets and Liabilities**

11.       As of May 31, 2011, the Debtors valued their assets on a consolidated basis at

$34,576,624, and their consolidated liabilities at $70,804,654.  *See* Miller Declaration at 7, ¶ 24.

12.       The Debtors' principal assets are two parcels of land adjoining each other at 50-

15 Beach Channel Drive (the "PGN Property") and 51-15 Beach Channel Drive (the "PHC Property"), Far Rockaway, New York (collectively, the "Properties"), and receivables, primarily from government agencies, in an amount that the Debtors do not disclose. *Id.*

13.     Encumbrances on the PHC Property include (a) a first mortgage lien in favor of the trustee of Industrial Development Agency bond holders in the approximate amount of $750,000; (b) a lien of the NYC Water Board in the approximate amount of $1,000,000; (c) several judgment liens in favor of the Benefit Funds in the approximate amount of $18.9 million; and (d) miscellaneous smaller judgment liens. *See* Motion at 7 ¶ 20. The Debtors estimate that the value of the PHC Property is substantially lower than the aggregate value of the encumbrances but they do not disclose the value of the PHC Property. *Id.*

14.     Encumbrances on the PGN Property include (a) a first mortgage lien in favor of the New York State Housing Finance Agency in the approximate amount of $950,000; (b) a lien of the NYC Water Board in the approximate amount of $222,000; (c) several judgment liens in favor of the Benefit Funds in the approximate amount of $3.4 million; and (d) a mortgage lien in the amount of $1,500,000 held by Revival Funding Co., LLC, an affiliate of Revival. *Id.* at 7-8, ¶ 23. The Debtors represent that the PGN Property has equity but they do not disclose its value or the amount of equity. *Id.*

15.     By Order dated September 21, 2011, the Court extended the Debtors' time to file their schedules and statement of financial affairs to October 17, 2011. *See* ECF Doc. No. 44. To date, the Debtors have not filed schedules or a statement of financial affairs.

### C.     Debtors' Pre-Petition Negotiations and Transactions With Revival

16.     On February 23, 2009, Medisys Health Network Inc. ("Medisys") took control of

the Debtors and assumed responsibility for the Debtors' administrative functions, including billing and cash management. *See* Miller Declaration, at 5-6, ¶ 20.

17. The Debtors allege that, after Medisys took control of these functions, the Debtors began to default on their obligations due to cuts in government reimbursement rates which affected their revenues. *Id.* at 5, ¶ 20.

18. As a result, the New York State Department of Health (the "DOH") became concerned about the Debtors' financial viability and ability to provide proper care for their patients and began setting deadlines for the Debtors to take corrective measures to avoid closure. *Id*. at 5-6, ¶ 20.

19. On August 22, 2011, six days after the Petitioning Creditors filed the involuntary cases against PHC, Medisys severed its relationship with the Debtors and demanded payment of debts owed to Medisys and its affiliates in the estimated at $6 million. *See* Miller Declaration, at 6, ¶ 21.

20. After the departure of Medisys, and in the face of the Debtors' continuing inability to meet their obligations and the DOH's threats to close the hospital and skilled nursing facility, the boards of directors of the Debtors (the "Old Board") solicited proposals, interviewed and negotiated with several groups interested in funding and running the Debtors' operations. *Id*.

21. The Debtors represent that the Old Board entertained proposals from "at least four different groups" and decided "after due diligence and negotiations" that Revival's proposal "was most likely to succeed in fulfilling [the Old Board's] goal of keeping PHC operating and providing services to the Rockaway Peninsula community." *Id*.

22.     On September 1, 2011, the Debtors executed a loan agreement, security

agreement and promissory note under which Revival lent the Debtors $250,000 on a secured

basis.  *Se*e Motion at 8, ¶ 25.

23.     On September 14, 2011, Revival loaned the Debtors $1.5 million in exchange for

a security interest in all of the Debtors' assets and a mortgage on the Properties.  *Id.*, ¶ 26.

**D.      The Agreements**

24.     On September 19, 2011, the Debtors filed the Motion, which seeks approval of (a)

the Letter Agreement, which provides, among other things, for the transfer of control of the

Debtors to Revival (collectively, the "Agreements"), (b) the Credit Agreement, under which

Revival is to provide the Debtors with up to $8 million in debtor in possession financing secured

by a superpriority administrative claim and a blanket lien on the Debtors' assets, and (c) the

Collateral Sharing Agreement, which provides for the Debtors' use of the Benefit Funds' cash

collateral and adequate protection payments and permits the liens securing the Debtor's

obligations under the Credit Agreement to prime the Benefit Funds' judgment liens.  *Id.* and ECF

Doc. No. 35.

**1.      The Letter Agreement**

25.     Even though the Debtors seek approval of the Letter Agreement in the Motion,

they do not discuss its terms or provide legal authority for approving it in the context of a motion

to approve debtor in possession financing under 11 U.S.C. § 364.

26.     The Letter Agreement provides, in part, that:

    a.      The Old Board authorizes the filing of chapter 11 petitions for the
            Debtors.  *Id.* at 1, § 1.a.

    b.      As of the date of the Letter Agreement, the Old Board "hereby appoints"

Todd Miller as chief restructuring office ("CRO") of the Debtors.  *Id*. at 3, § 4.  The CRO is an employee of Revival.  *See* Exhibit I to the Miller Declaration.[1]

c.    On the date they file chapter 11 petitions, the Debtors will file a motion to approve the Letter Agreement and the Credit Agreement.  *Id*., § 1.b.

d.    Revival will have no further obligations under the Agreements unless the Court enters an order approving them within thirty days after the filing date, provided, however, that Revival may extend the deadline at its sole option.  *Id.*

e.    The Old Board will retain the law firm of Abrams Fensterman, *et al.* ("Abrams"), as the Debtors' bankruptcy counsel, and Alvarez & Marsal ("A&M"), as the Debtors' financial advisors.  *Id.*, § 1.c.

f.    On the date of the Letter Agreement, Revival agrees to make payments, which are "separate and apart from the debtor in possession financing," to (i) Abrams in the amount of $140,000 comprising $15,000 in fees incurred in negotiating the Letter Agreement and $125,000 as an initial retainer for representing the Debtors in their chapter 11 cases and (ii) A&M in the amount of $125,000 as an initial retainer for services rendered during the chapter 11 cases.  *Id.* at 2, § 1.d.

g.    On the date the parties execute the Letter Agreement, the members of the Old Board will deliver "letters in the form of Exhibit D" to escrow pending Bankruptcy Court approval of the Agreements.  *Id*. at 3, § 3.b. The Debtors did not attach Exhibit D to the Letter Agreement filed with the Court.  *See* ECF Doc. No. 35.  Exhibit D presumably contains a form letter of resignation.

h.    Upon Bankruptcy Court approval of the Agreements, "New Directors" will take control of the Debtors.  *Id*. at 3, § 3, *Board Transfer*.  The Letter Agreement does not define the term "New Directors" or disclose who will appoint them or when they will gain control of the Debtors.  However, based on the context, it is likely that Revival will appoint the New Directors and that they will take control of the Debtors upon Bankruptcy Court approval of the Agreements.

i.    After the transfer of control, "Revival shall cause the New Directors to

---

[1]    The Debtors have not filed an application to retain the CRO under 11 U.S.C. § 363 because they allege that it is not necessary.

continue to retain Abrams and [A&M]" as professionals in the Debtors' chapter 11 cases." *Id*. at 1, § 1.c.

j.      Revival will provide funding of up to $27 million to the New Directors "for the sole purpose of funding a plan of reorganization which effects a discharge of all of the outstanding obligations of [the Debtors]." *Id*. at 3, § 2.c.

k.      The New Directors will grant "observer status" to six members of the Old Board, who will have no right to vote, and form a community advisory board which "shall consist solely of any members of [the Old Board] that wish to participate." *Id.* at 3, § 3.c.

l.      The New Directors will not terminate the Debtors' operations for at least three years from the date of the Letter Agreement. *Id.* at 3, § 3.b.

**2.      The Credit Agreement**

27.     Under the Credit Agreement, Revival will provide the Debtors with a post-petition line of credit up to $8 million at 6 percent interest, so long as the Debtors are current, and 9 percent interest if the Debtors are in default. *See* Credit Agreement at 2, §§ 1.1.a and 1.3.a. 28.     The maturity date of the loan will occur on the earlier of (a) thirty days after the commencement of the chapter 11 cases if the Court has not entered a final order approving the Agreements; (b) two years from the date of the Agreement; (c) upon the appointment of a trustee, receiver or any other court-appointed entity that will divest the CRO of control over the Debtors' operations; or (d) the confirmation of a plan proposed by any party other than Revival. *Id.* at 3, § 1.5.

29.     The Credit Agreement provides, in part, that:

a.      To secure repayment of the loan, the Debtors will grant Revival a superpriority administrative claim and a first priority lien on all of the Debtor's assets, including assets of the bankruptcy estate as defined under 11 U.S.C. § 541, their products and proceeds, and after acquired property, but excluding avoidance actions and their proceeds. *Id.* at 3, §1.8(b) and 15, §  8.1, and Annex A.

9

b.    The superpriority administrative claim is subject only to a carve out for the payment of United States Trustee quarterly fees plus interest. *Id.* at 3, § 1.8.b. The liens are subject to a carve out for United States Trustee quarterly fees, professional fees awarded by the Court up to $500,000, and the reasonable fees and expenses of a chapter 7 trustee up to $15,000. *Id.* at 3, §1.8(b) and 15, § 8.1.

c.    The Debtors are treated as one entity but it is silent as to whether there is any allocation of liability between them. *Id.* at 1.

d.    Although the Credit Agreement references the Debtor's obligation to make periodic repayments of advances under the Credit Agreement, it does not contain a provision requiring the Debtors to make periodic payments prior to the maturity date or specifying the amount or any other details. *Id*.

e.    The Debtors will indemnify Revival, its directors, agents, employees and professionals (the "Indemnitees") for any liabilities arising from the Agreements and related transactions unless there is a final order adjudging that a liability arose from the gross negligence or willful misconduct of any Indemnitee. *Id.* at 12, § 7.1. Revival will have no liability to the Debtors for any losses they suffer as a result of transactions arising under the Agreements unless the losses resulted from Revival's gross negligence or willful misconduct. *Id.* at 13-14, § 7.9.

f.    The Debtors will waive their right to a jury trial. *Id.* at 14, § 7.11.

g.    The Debtors will be in default of their obligations under the Credit Agreement if, among other things, (a) there is a change in control of the Debtors other than the appointment of the New Directors; (b) the Debtor files or supports a plan or the Court enters an order approving a plan that does not provide for full repayment of Revival's loan within ten days after the entry of a confirmation order; (c) the Court enters an order modifying any of the Agreements, any interim order, or the final order approving the financing; (d) the Court directs the appointment of a trustee; (e) the Debtors sell substantially all of their assets without Revival's consent, either through a plan or a § 363 sale, that does not provide for payment of Revival in full; (f) the Court dismisses or converts the Debtors' cases; or (g) the Court enters an order terminating the automatic stay to allow any junior lien holder to foreclose. *Id*. at 9-10, § 5.1(d) and (g).

h.    Upon the Debtors' default, Revival has the right to accelerate the debt and exercise its remedies. Id. at 11, § 5.3.

      i.        "The security interest granted by [the Debtors] shall all at all times be valid, perfected, and enforceable against [the Debtors] and all third parties in accordance with terms of this Agreement . . . ." *Id.* at 15, § 8.2(a). There is no provision that allows the Committee or a trustee to challenge the validity of Revival's pre- or post-petition liens.

### 3. The Collateral Sharing Agreement

30.     Under the Collateral Sharing Agreement, the Debtors will pay the Benefit Funds $157,000 per week as adequate protection for the Debtors' use of cash collateral for expenses set forth in the cash collateral budget. *Id.*, ¶ 1.

39.     The Collateral Sharing Agreement provides, in part, that:

     a.     The Benefit Funds agree to Revival's priming lien. *Id.*, ¶ 3.

     b.     If assets on which both Revival and Benefit Funds have liens are liquidated, Revival will receive 60% and the Benefit Funds 40% of the proceeds, subject to the carve out, until the obligations are paid in full. *Id.*

## III. OBJECTION

### A. The Agreements Divest the Debtors of Their Ability to Fulfill Their Duties as Fiduciaries and Divert the Benefits of the Bankruptcy Process from All Creditors to Revival in Violation of 11 U.S.C. § 364.

The Debtors seek approval of financing under Section 364(d), which provides, in part, that:

    (d) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

        (A) the trustee is unable to obtain such credit otherwise; and

        (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1)(A) and (B).

The Court may authorize the debtor to incur debt secured by a priming lien only if the debtor cannot obtain financing from any other source. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("obtaining credit under section 364(d) may not be authorized if it appears that credit can be obtained under the other subsections of 364"). "The entire purpose of [debtor in possession] financing is to preserve the going concern value of the Debtors, such that there will be money in the future available to the Debtors." *In re Berry Good, LLC*, 400 B.R. 741, 745 (Bankr. D. Ariz. 2009) (quoting *In re DJK Residential, LLC*, 2008 WL 650389, at *3 (S.D.N.Y. March 7, 2008). *See also In re Aqua Assocs*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (the debtor must show that the financing will preserve assets of the estate).

Approval of financing under Section 364 is within the discretion of the Court. *Ames*, 115 B.R. at 37. If the debtor establishes the lack of alternative resources, the necessity for the financing and adequate protection, the Court must then consider whether the agreement prejudices "the powers and rights that Bankruptcy Code confers for the benefit of all creditors." *Id.* (citations omitted). A financing agreement cannot divest the debtor in possession of the ability to exercise its fiduciary duties or "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of [the post-petition lender]." *In re Tenney Village Co., Inc*., 104 B.R. 562, 568 (Bankr. D.N.H. 1989). A financing agreement that allows the lender to limit the ability of debtor's counsel to take actions against the lender also calls into question counsel's disinterestedness under 11 U.S.C. § 327(a) and, at the very least, creates the appearance of impropriety. *Id.* at 568.

The elements of the financing agreements at issue in *Tenney Village* are strikingly similar to the terms of the Agreements in these cases. Under the financing agreement in *Tenney Village*,

the lender required the debtor, the operator of a ski resort, to retain a new CEO subject to the lender's approval; if the debtor fired the CEO without the lender's consent, the bank would accelerate the debt. 104 B.R. at 567. The lender took control of the debtor's construction of condominiums, requiring pre-approval of plans and placing its consultant in charge of the project with authority to stop work at any time. *Id*. The lender required the debtor to obtain approval of its plan to market the condominiums and to hire a new marketing manager that the lender approved. *Id*. The lender set the prices for the condominiums and required the debtor to remit all sales proceeds, minus only the broker's commission, to the lender, rather than allowing the debtor the use of bankruptcy estate property subject to a cash collateral agreement. *Id.* The lender limited the amount of funds available for debtor's counsel's fees, set his hourly rate and refused to allow counsel to incur fees to assert any claims against the lender. *Id*. at 567-568. The lender dictated terms of any plan that a party in interest might propose. *Id*. at 568.

The court in *Tenney Village* denied approval of the financing agreement under Section 364 in light of these onerous terms. *Id.* at 571. According to the Court,

> Under the guise of financing a reorganization, the Bank would disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit, place the Debtor in bondage working for the Bank, seize control of the reins of reorganization, and steal a march on creditors in numerous ways. . . . Under its rights of approval and supervision, the Bank would in effect operate this Debtor's business. The Code permits this to be done only by a debtor or a trustee. . . . And the Bank would have the ultimate say over the very goal of this Chapter 11 case, a confirmed plan of reorganization.

*Id*. at 568.

Under the Agreements, Revival takes control of the Debtors' board of directors and gains total authority over the Debtors' business operations through its employee, Mr. Miller, the CRO. *See* Letter Agreement at 3, § 4. However, even though the Debtors lose possession and control,

13

Revival requires them to maintain, preserve and protect their assets in the exercise of the duties as debtors-in-possession. *See* Credit Agreement at 5, § 2.4. Moreover, Revival paid Abrams' and A&M's retainers, directed the New Directors to engage them in the cases, and limited the amount of funds available to pay professional fees. *See* Letter Agreement at 1-2, §§ 1.c and d, and Credit Agreement at 4, § 1.8. The Agreements cut off any meaningful opportunity for competing plans by dictating terms for plans proposed by anyone but Revival. *See* Credit Agreement at 3, § 1.5, and 9-10, § 5.1(d). The Credit Agreement not only precludes the Debtors from challenging Revival's lien, but it requires them to indemnify Revival for any claims made against Revival and arising from the Agreements. *Id.* at 15, § 8.2(a).

The Agreements do not meet the requirements of 11 U.S.C. § 364. They not only prejudice the powers and rights of all creditors under the Bankruptcy Code, but they also dispossess the Debtors of estate assets and divest them of the ability to fulfill their fiduciary duties as debtors in possession. On this basis, the Court should deny the Motion.

**B.     The Agreements Constitute a *Sub Rosa* Plan.**

*Sub rosa* plans are prohibited under the Bankruptcy Code because they allow a debtor in possession to "enter into transactions that will, in effect, 'short circuit the requirements of chapter 11 for confirmation of a reorganization plan.'" *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (quoting *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)). Chapter 11 debtors "cannot sidestep the protection creditors have when it comes time to confirm a plan of reorganization." *Institutional Creditors of Continental Air Lines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 780 F.2d 1123, 1126-28 (5th Cir. 1986). Transactions that prejudice

14

"a right afforded creditors or equity security holders in the chapter 11 plan process [or] effect a lock up of the terms of a plan will not be permitted." *In re Crowthers McCall Pattern, Inc*., 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990). Among other things, *sub rosa* plans dictate the terms of the plan, restructure the debtor's business or restrict creditors' rights. *In re Tower Auto., Inc.*, 342 B.R. 158, 163 (Bankr. S.D.N.Y. 2006), *aff'd,* 241 F.R.D. 162 (S.D.N.Y. 2006).

In *In re Belk Properties*, *LLC*, 421 B.R. 221 (Bankr. N.D. Miss. 2009), the Debtor sought approval of debtor in possession financing under facts similar to the facts in these cases. The financing agreement provided that the lender would take control of the debtor and obtain a controlling membership interest. *Id.* at 223. The Court denied approval of the financing agreement because it constituted a *sub rosa* plan. *Id*. at 225-226. The Court reasoned that if it approved the financing agreement, the lender would, in effect, become the debtor and the terms of the agreement dictated the treatment of creditors and the bankruptcy estate. *Id*. at 225. Upon approval of the financing agreement, "the plan of reorganization is a *fait accompli*, that is, it is an accomplished fact for all practical purposes." *Id*. at 225-226.

Likewise, the Agreements give Revival disproportionate leverage over the plan process to the detriment of creditors. The Debtors' debt to Revival under the Credit Agreement matures upon confirmation of a plan proposed by anyone other than Revival and Revival has the right to accelerate the debt and exercise its remedies if the Debtors or any other party files a plan that does not provide for the payment of Revival in full, in cash, within ten days after confirmation of the plan. *Id*. at 3, § 1.5, 9, § 5(d), and 11, § 5.3.

The Letter Agreement vests Mr. Miller, an employee of Revival, in the key leadership and decision-making role of CRO. *See* Letter Agreement at 4, § 4. In addition, Revival paid

Abrams' and A&M's retainers and directed the New Directors to retain them, ensuring that both of the Debtors' professionals are under Revival's control. *Id.* at 1-2, §§ 1.c and d. Perhaps most critically, the Letter Agreement provides for the transfer of control of the Debtors from the Old Board to Revival. *Id.* at 3, § 3. All of the current members of the Old Board, with the exception of one, are required to resign and be replaced by representatives of Revival. *Id.* Placing the Debtors under the control of Revival at both the Board and executive levels, and allowing Revival to dictate terms of competing plans tip the balance of power, at this early stage of the cases, to Revival, and inhibits meaningful negotiations with other creditors and parties in interest, potentially forcing them to accept plan terms without recourse or risk implosion of the Debtors' cases. The Court should, therefore, deny approval of the Agreements as constituting an impermissible *sub rosa* plan.

C.     **The Bankruptcy Code Provides Alternatives for the Debtors to Meet their Charitable Goals and Maximize the Value of the Estates, and Therefore the Court Should Deny Approval of the Letter Agreement and Consider Approval of the Credit Agreement on Less Onerous Terms.**

A fundamental and overriding objective of business reorganizations in bankruptcy is to enable the debtor to preserve its business as a going concern. *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528 (1984) ("the fundamental purpose of reorganization is to prevent the Debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources"). The paramount goal of any bankruptcy case, however, is to maximize the return to the estate. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that the enhancement of value in bankruptcy sales is "a primary objective" of the Bankruptcy Code). To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing value under the business judgment standard.

*See Official Committee of Subordinated Bondholders v. Integrated Res., Inc.*, 147 B.R. 650, 656-659 (S.D.N.Y. 1992) (recognizing that such procedures "encourage bidding and maximize the value of the debtor's assets").

Here, the Debtors propose a transaction aimed at preserving the Debtors' operations for the benefit of the community. The overall transaction, however, is devoid of procedures reasonably intended to maximize the value of the estates. Contrary to the Debtors' assertions, these goals are not mutually exclusive. The Debtors have multiple options, including an expedited plan process and perhaps a sale, transfer or use of property outside the ordinary course of business, with appropriate marketing and notice and subject to higher and better offers under § 363. If the Debtors remain unwilling to proceed in a manner that ensures the realization of the maximum value of the estates, the Court should reject the Debtors' judgment "for the purpose of safeguarding the interest of parties concerned, such as creditors. . . ." *See In re Charalabos Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) (court may overrule the trustee's business judgment if a transaction did not provide the maximum return for the estate) (citing *In re Blue Coal Corp*, 59 B.R. 157, 163 (Bankr. M.D.Pa. 1986)). The Debtors have a duty to maximize value for the estates while they seek to meet the needs of the community at large.

Accordingly, the Court should deny approval of the Letter Agreement and direct the Debtors to pursue relief in a more appropriate procedural context.

## IV.  Additional Objections to the Agreements and Proposed Financing Order.[2]

The United States Trustee has informally raised various objections to specific provisions

---

[2]     The United States Trustee has no objection to the terms of the Collateral Sharing Agreement.

in multiple versions of the proposed financing orders, the Debtors are apparently still negotiating with the Committee and other parties in interest and have not yet circulated an updated proposed order. In addition to the objections set forth above, the United States Trustee objects to several provisions of the most recent proposed order.

### A. Unsupported Findings.

If the Debtors seek findings regarding the unavailability of alternative financing, the good faith nature of its negotiations with Revival or the fairness and reasonableness of the terms of lending, they must present competent evidence to support these findings for the Court's consideration. As of the date hereof, the Debtors have not done so and, therefore, the Order should not be entered in its present form.

### B. Cross-Collateralization.

Because cross-collateralization of a pre-petition loan with post-petition assets may elevate an unsecured or undersecured loan to fully secured status ahead of other claims, creditors are entitled to be heard on whether the potential benefits of the arrangement in preserving a business outweigh the prejudice to them. *Ames*, 115 B.R. at 39 (citation omitted). As the Court in *Ames* stated,

> The debtor in possession is hardly neutral. Its interest is in its own survival, even at the expense of equal treatment of creditors, and close relations with a lending institution tend to prevent the exploration of other available courses in which a more objective receiver or trustee would engage.

*Id.* (citations omitted). Cross-collateralization is generally disfavored by the courts. *See Otte v. Manufactures Hanover Commercial Corp. (In re Texlon Corp.)*, 596 F.2d 1092, 1098 (2d Cir. 1979) (cross-collateralization is contrary to the spirit of the Bankruptcy Act). Courts in this district utilize a four-part test for determining if cross-collateralization should be permitted: (1)

18

the business will not survive without the financing; (2) the debtors cannot obtain alternate financing on acceptable terms; (3) the lender will not accept less favorable terms; and (4) the proposed financing is in the best interest of the general creditors. *In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983); *see also Ames*, 115 B.R. at 39 (cross-collateralization is appropriate if the debtor has properly exercised its business judgment)

The United States Trustee objects to allowing Revival to cross-collateralize its pre-petition debt with post-petition assets. The Court should not approve any cross-collateralization provisions because the Debtors have failed to satisfy the four-part test.

**C**.      **Waiver of Section 506(c) Surcharge**.

The Debtors and Revival have not established Revival's entitlement to a provision in the financing order that limits the right of any party, including the Committee, from filing a motion under Section 506(c) and having the Court consider that motion. Accordingly, the United States Trustee objects to the inclusion of any 506(c) waiver provision in the financing order.

**D.      Carve Out for Chapter 11 Professional Fees and Burial Expenses.**

The carve out for chapter 11 professional fees and expenses in the Credit Agreement is inadequate to fairly compensate them. To date, the Debtors have filed retention applications for Abrams, Nixon Peabody as special counsel, and A&M. In addition, the Committee intends to seek approval of the retention of counsel and a financial advisor. These chapter 11 cases will likely also involve the services of numerous other professionals. *See* ECF Doc. Nos. 49, 55, 58, 76, 79, 80, 81. The proposed $500,000 carve out is inadequate, especially considering that, for example, the Debtor proposes to pay a single professional, A&M, a flat fee of $160,000 per month. *See* ECF Doc. No. 81.

Based on the Debtors' Cash Flow Forecast, Revival contemplates paying the Ombudsman and his counsel from the carve out. However, Revival has only allocated $60,000 to the Ombudsman and his counsel for the first thirteen weeks of the cases, which will not cover the fees and costs that they will incur. The carve out should be increased to at least $100,000 for the first thirteen weeks.

The proposed carve out for the fees and expenses of a hypothetical chapter 7 trustee is similarly inadequate. These are relatively complex cases and the proposed $15,000 carve out will not give a hypothetical chapter 7 trustee the resources he or she needs to properly liquidate these estates.

### E.     Liability for Advances and Periodic Repayments

The Credit Agreement treats the Debtors as a single entity and it is unclear how liability for advances is allocated. The Debtors or Revival should disclose whether liability is joint and several and how advances are allocated and include this information in the final order.

The Credit Agreement contemplates that the Debtors will make periodic repayments to Revival. *Id*. at 2, §§ 1.2 and 1.3. The Credit Agreement, however, does not provide any details of these payments. The proposed order, or an addendum to the Credit Agreement, should disclose how much the monthly payments are, how Revival will apply the payments, including whether it intends to pay down pre-petition debt, and how the payments will be credited to PGN and PCH. The Court should direct disclosure of repayment terms and deny approval of any repayments of pre-petition debt.

### F.     Challenge period

The Debtors have conceded that Revival's liens under the Credit Agreement are valid,

perfected and enforceable against the Debtors and all third parties. *See* Credit Agreement, at 15, § 8.2. There is no provision in the Credit Agreement for anyone to challenge the liens, which precludes the Committee or a trustee from conducting any investigation. The Court should direct the Debtors to include a provision in any financing order granting the Committee sixty days from the date of entry of the order to investigate and challenge the liens and an additional seventy-five days from the date a trustee is appointed if the original challenge period has not expired.

      **G.**       **The $27 million Payment to the New Directors to Fund a Plan**

The Letter Agreement provides that Revival will provide the New Directors with $27 million in cash or assumption of liabilities to fund a plan. *Id*. at 3, § 2.c. There is no further disclosure of the nature of the payment. Revival should disclose whether it is a loan, a gift, a capital contribution or other type of transfer and provide the United States Trustee and the Committee with any documentation.

## V.    CONCLUSION

WHEREFORE, the United States Trustee requests that the Court deny the Motion and

grant any other and further relief as is just.

Dated: Brooklyn, New York
       October 4, 2011

                                        Respectfully submitted,

                                        TRACY HOPE DAVIS
                                        UNITED STATES TRUSTEE
                                        FOR REGION 2

                                        By: */s/ William E. Curtin*
                                        William E. Curtin
                                        Trial Attorney
                                        271 Cadman Plaza East, Suite 4529
                                        Brooklyn, New York 11201
                                        Tel. No. (718) 422-4960
                                        Fax. No. (718) 422-4990